[Cite as *In re H.M.K.*, 2013-Ohio-4317.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# WYANDOT COUNTY

**IN THE MATTER OF:**

    **H.M.K.,**                          **CASE NO. 16-12-15**

**ADJUDICATED DEPENDENT CHILD.**

                                          **O P I N I O N**

**[DIANE K. - APPELLANT].**

---

**IN THE MATTER OF:**

    **J.B.K.,**                         **CASE NO. 16-12-16**

**ADJUDICATED DEPENDENT CHILD.**

                                          **O P I N I O N**

**[DIANE K. - APPELLANT].**

---

**Appeals from Wyandot County Common Pleas Court
Juvenile Division
Trial Court Nos. C 2102010 and C 2102011**

**Judgments Affirmed**

**Date of Decision: September 30, 2013**

---

**APPEARANCES:**

    *Charles R. Hall, Jr.* **for Appellant**

    *Douglas D. Rowland* **for Appellee, Wyandot Co. DJFS**

**PRESTON, P.J.**

{¶1} Mother-appellant, Diane K., appeals the trial court's judgment entry awarding permanent custody of H.M.K. to the Wyandot County Department of Job and Family Services ("WCDJFS") and the trial court's judgment entry awarding legal custody of J.B.K.[1] to his paternal uncle and aunt, Chris and Tara H. For the reasons that follow, we affirm the judgments of the trial court.

{¶2} On August 27, 2010, WCDJFS filed complaints alleging that H.M.K. was a dependent child as defined in R.C. 2151.04(C), and that J.B.K. was a dependent and neglected child as defined in R.C. 2151.04(C) and 2151.03(A)(2). (Doc. Nos. 1, 1). The complaints were based on substantiated allegations of Diane's failure to supervise her children. (*Id.*); (*Id.*). H.M.K.'s case was assigned trial court case no. C 2102010, and J.B.K.'s case was assigned trial court case no. C 2102011. (*Id.*).[2]

{¶3} Prior to filing the complaints in this case, WCDJFS had previous involvement with Diane involving her older children, one of which was allegedly sexually abused by Diane's male "friend" who was living in the home. (*Id.*). Similarly, this case involved substantiated allegations that Diane's live-in

---

[1] The case concerning this minor child originally was filed using the initials "J.B.R.," but the initials of the minor child were subsequently changed to "J.B.K." upon WCDJFS' motion. (Doc. Nos. 1, 32). Although the final judgment entry uses the initials "J.H.K.," it does not appear that the trial court actually changed the case name; therefore, we elect to use the initials "J.B.K." herein for this minor child. (Doc. No. 118).

[2] Where it is unclear, citations to the docket will include the trial court case number; otherwise, only the docket number will be cited. Filings concerning H.M.K. are in trial court case no. C 2102010, and filings concerning J.B.K. are in trial court case no. C 2102011.

boyfriend physically and sexually abused H.M.K.  (*Id.*).  With respect to J.B.K., WCDJFS alleged that Diane failed to properly care for J.B.K. when he was a toddler and allowed J.B.K. to escape from her home.  (*Id.*).

**{¶4}** On September 7, 2010, Diane appeared and was appointed counsel; thereafter, the trial court entered conditional denials to the charges in the complaints regarding H.M.K. and J.B.K. on Diane's behalf.  (Doc. Nos. 22, 26).  At that time, the State indicated that it was just notified of the identity of children's fathers and would ascertain their addresses and attempt service.  (*Id.*).

**{¶5}** On September 13, 2010, Marvin H., J.B.K.'s father, appeared and was appointed counsel; thereafter, the trial court entered conditional denials to the charges in the complaint regarding J.B.K. on Marvin's behalf. (Doc. No. 29).  The State notified the trial court that it had attempted to serve H.M.K.'s father, Michael B., without success, and it believed that he was avoiding service, so the State would pursue service by publication.  (Doc. No. 30).

**{¶6}** On September 14, 2010, WCDJFS filed a motion requesting that the trial court continue its adjudication hearing so that H.M.K.'s father, Michael B., could be served by publication.  (Doc. No. 23).

**{¶7}** On September 20, 2010, the trial court adjudicated H.M.K. a dependent child as to Diane upon her admission.  (Doc. No.  33).  On this same day, the trial court also adjudicated J.B.K. a dependent child upon Diane's

admission, and the State dismissed Count Two charging Diane with neglect. (Doc. No. 32). The trial court granted WCDJFS protective supervision of the children for the development of a case plan with the goal of reunification. (Case No. C 2102010, Doc. No. 33); (Case No. C 2102011, Doc. No. 32).

{¶8} On October 18, 2010, the trial court adjudicated H.M.K. a dependent child as to Michael B., who did not appear for the proceedings after receiving notice, according to Diane. (Doc. No. 35). That same day, the trial court adjudicated J.B.K. a dependent child as to Marvin H. upon his admission. (Doc. No. 34).

{¶9} On November 8, 2010, the trial court held a dispositional hearing and, thereafter, took the matter under advisement for post-hearing written arguments, because the Guardian Ad Litem ("GAL") requested that the trial court grant WCDJFS temporary custody while WCDJFS requested only protective supervision. Counsel for Diane advocated for a middle-of-the-road approach whereby the children would remain in their mother's care with strict orders from WCDJFS concerning their supervisory capacity. (Case No. C 2102011, Doc. Nos. 35-37); (Case No. C 2102010, Doc. Nos. 36-38).

{¶10} On December 14, 2010, the trial court issued its judgment, ordering that WCDJFS be awarded protective supervision. (Case No. C 2102011, Doc. No. 38); (Case No. C 2102010, Doc. No. 39). The trial court also ordered, in pertinent

part, that Diane keep the children away from violent or sexual offenders; H.M.K. be removed from all but one social networking website; and, H.M.K. "friend" a WCDJFS' employee on Facebook so that H.M.K.'s communications could be monitored. (*Id.*); (*Id.*).

{¶11} On February 9, 2011, WCDJFS filed a motion to show cause why Diane should not be held in contempt of court for failing to abide by the court's orders. (Case No. C 2102010, Doc. No. 43); (Case No. C 2102011, Doc. No. 44). In particular, WCDJFS alleged that Diane: allowed adult men, who were friends of her adult daughter, to stay in the residence with the minor children; failed to fill out an application for day care through WCDJFS; refused to take a budgeting class even though she continued to have financial difficulties; failed to follow-up with school officials regarding H.M.K.'s academic performance; failed to enroll H.M.K. in extracurricular activities in school; failed to ensure that H.M.K. accepted an agency employee's "friend" request on Facebook; failed to enroll J.B.K. in Head Start; and, failed to attend counseling at Firelands. (*Id.*); (*Id.*).

{¶12} On February 28, 2011, the trial court held a hearing on the motion, Diane admitted she was in contempt of the trial court's orders, and the trial court sentenced Diane to 30 days in jail but suspended the sentence for Diane to purge the contempt. (Case No. C 2102010, Doc. No. 48); (Case No. C 2102011, Doc. No. 49).

{¶13} On March 11, 2011, Marvin H. filed a motion to establish parenting time with J.B.K. (Doc. No. 52). On March 16, 2011, Marvin H. filed an amended motion for parenting time, alleging that the trial court's order that J.B.K. have no contact with anyone convicted of a sexual offense effectively denied him of any parenting time because he was convicted of a sexual offense in 2000. (Doc. No. 53). Marvin alleged that he inappropriately touched his then-girlfriend's four-year-old daughter while she was bathing. (*Id.*). However, Marvin alleged that he was rehabilitated after serving two years in prison, attending one and a half years of sexual-offender treatment, and receiving five years of post-release counseling through an independent agency. (*Id.*).

{¶14} On April 5, 2011, WCDJFS responded to the motion, arguing that the department does not have custody of J.B.K., rather protective supervision, and Marvin's custody dispute should be addressed in the pending paternity case, Wyandot County Juvenile Court I.E. case I 2103040. (Doc. No. 56).

{¶15} On April 15, 2011, the trial court dismissed Marvin's amended motion to establish parental visitation rights, finding that Marvin should have addressed visitation in the paternity case. (Doc. No. 57).

{¶16} On April 29, 2011, WCDJFS filed a motion for emergency custody of the children, alleging that Diane allowed the children to visit Marvin H., a registered sex offender. (Case No. C 2102010, Doc. No. 51); (Case No. C

2102011, Doc. No. 58). The trial court held a hearing on the motion that same day. Thereafter, on May 9, 2011, the trial court issued an entry concluding that WCDFS' emergency removal was proper, continuing WCDJFS' temporary custody of the children, and scheduling a full hearing. (Case No. C 2102010, Doc. No. 56); (Case No. C 2102011, Doc. No. 62).

{¶17} On June 29, 2011, WCDJFS filed a supplemental motion for emergency custody of H.M.K., alleging that, while in the foster home, J.B.K., who was five years of age, was humping H.M.K.; H.M.K., who was ten years of age, possessed pornography on her Nintendo DIS; and, H.M.K. had a disturbing fascination with the condom isle at the grocery store. (Case No. C 2102010, Doc. No. 61). On that same day, WCDJFS filed a motion for an order placing J.B.K. in the temporary custody of his paternal uncle and aunt, Chris and Tara H. (Case No. C 2102011, Doc. No. 69).

{¶18} On July 5, 2011, the trial court filed an entry noting that it would be inappropriate to grant Chris and Tara H. temporary custody of J.B.K. since there is a pending hearing concerning temporary custody as between Diane and WCDJFS, and J.B.K. is currently developing a relationship with his foster parents. (Case No. C 2102011, Doc. No. 73). Consequently, the trial court set the motion for hearing on the same date as the hearing scheduled to rule on WCDJFS' motion for temporary custody. (*Id.*).

{¶19} On September 9, 2011, Marvin H. filed a motion for custody of J.B.K. (Case No. C 2102011, Doc. No. 79).

{¶20} On September 22, 2011, WCDJFS filed a motion for Diane to have unsupervised visitation with the children. (Case No. C 2102010, Doc. No. 71); (Case No. C 2102011, Doc. No. 84). That same day the Court Appointed Special Advocate ("CASA"), through the GAL, filed an objection to WCDJFS' motion for unsupervised visitation. (Case No. C 2102010, Doc. No. 72); (Case No. C 2102011, Doc. No. 85). Also that same day, Marvin H. filed another motion seeking visitation with J.B.K. (Doc. No. 86).

{¶21} On October 18, 2011, the trial court held a hearing on the various motions. On October 24, 2011, Marvin H., with the parties consent, filed an exhibit consisting of his sexual-offender treatment records, assessments, and progress reports in support of his motion for visitation. (Doc. No. 89).

{¶22} On January 13, 2012, the trial court filed an entry granting Marvin H. visitation with J.B.K. under WCDJFS' supervision. (Doc. No. 91). The trial court also granted Diane's motion for unsupervised visitation with H.M.K. for two to three hours at a time, as scheduled with WCDJFS; however, the trial court denied Diane's motion for unsupervised visitation with J.B.K. at this time since Diane had failed to properly supervise him. (Case No. C 2102010, Doc. No. 77); (Case

No. C 2102011, Doc. No. 91). The trial court ordered that the children remain in WCDJFS' temporary custody. (*Id.*); (*Id.*).

{¶23} On March 8, 2012, WCDJFS filed a motion for an order placing J.B.K. in the temporary custody of his paternal uncle and aunt, Chris and Tara H. (Doc. No. 96). WCDJFS represented that the foster mother was no longer a placement option, and that J.B.K. has bonded with his uncle and aunt throughout the case. (*Id.*). On March 14, 2012, Marvin H. filed an objection to the motion. (Doc. No. 98). On March 20, 2012, the trial court continued WCDJFS' temporary custody of J.B.K.; however, it allowed J.B.K. to be placed into Chris and Tara H.'s home on the condition that they pass a home study since no other foster homes were available. (Doc. No. 99).

{¶24} On May 2, 2012, WCDJFS filed a motion requesting that Diane's unsupervised visitation time with H.M.K. be increased to six hour increments, which motion was granted. (Doc. Nos. 85-86). On this same date, WCDJFS filed a motion requesting that Diane be granted unsupervised visitation with J.B.K., and that J.B.K. be placed in the temporary, relative custody of Chris and Tara H. (Case No. C 2102011, Doc. No. 103).

{¶25} On May 24, 2012, the trial court granted Diane unsupervised visitation with J.B.K.; however, the trial court ordered WCDJFS to conduct unannounced visits and immediately report any concerns to the court. (Doc. No.

104). The trial court also granted Chris and Tara H. temporary, relative custody of J.B.K. (*Id.*).

**{¶26}** On June 13, 2012, however, WCDJFS' filed a motion requesting that Diane's visitation time with the children be returned to supervised visitation since Diane failed to properly supervise them during her unsupervised visitation time. (Case No. C 2102010, Doc. No. 88); (Case No. C 2102011, Doc. No. 106). The trial court granted the motion the same day. (Case No. C 2102010, Doc. No. 89); (Case No. C 2102011, Doc. No. 107).

**{¶27}** On July 27, 2012, WCDJFS filed a motion seeking permanent custody of H.M.K. (Doc. No. 91). That same day, WCDJFS filed a motion asking the court to grant Chris and Tara H. legal custody of J.B.K. (Doc. No. 108).

**{¶28}** On October 24, 2012, the trial court held a hearing on the motion for permanent custody of H.M.K. and motion for legal custody of J.B.K. (Case No. C 2102010, Doc. No. 97); (Case No. C 2102011, Doc. No. 109).

**{¶29}** On November 7, 2012, the trial court granted Chris and Tara H. legal custody of J.B.K., awarded Diane reasonable supervised visitation as agreed between the parties, and terminated WCDJFS' protective supervision. (Doc. No. 118). The trial court also ordered Diane to provide the Wyandot County Child Support Enforcement Agency ("CSEA") with income information for child support calculation purposes, and CSEA was ordered to provide copies of the

calculation to the parties for a seven-day written objection period. (*Id.*). The trial court did not grant Marvin H. visitation time with J.B.K.; however, Marvin H. indicated at the hearing that, if Chris and Tara H. were to receive placement, "he was done." (*Id.*). On November 13, 2012, the trial court filed a nunc pro tunc entry removing personal identifiers from its previous entry. (Doc. No. 120).

{¶30} On November 27, 2012, CSEA filed notice of the child support calculation with the trial court and the parties, indicating that Diane's child support for J.B.K. should be $314.30 per month, plus a $6.29 per month processing fee, when health insurance is provided. (Doc. No. 121).

{¶31} On November 28, 2012, the trial court granted WCDJFS permanent custody of H.M.K., terminating the parental rights of Diane and Michael B. (Case No. C 2102010, Doc. No. 97).

{¶32} On December 10, 2012, Diane filed a notice of appeal from the trial court's judgment entry awarding WCDJFS permanent custody of H.M.K., which was assigned appellate case no. 16-12-15. (Doc. No. 101). That same day she filed a written objection and request for a hearing regarding the child support calculation for J.B.K. (Doc. No. 123). The trial court ordered that Diane pay

$314.30 per month in child support for J.B.K. that same day without a hearing. (Doc. No. 124).[3]

{¶33} On December 13, 2012, Diane filed a notice of appeal from the trial court's judgment entry granting Chris and Tara H. legal custody of J.B.K., which was assigned appellate case no. 16-12-16. (Doc. No. 125).

{¶34} On February 28, 2013, this Court sua sponte consolidated the cases for appeal purposes, with all filings under case no. 16-12-15.

{¶35} Diane now appeals raising two assignments of error specially related to H.M.K., one assignment of error specifically related to J.B.K., and two assignments of error related to both children.[4] For ease of analysis, we will address the assignments of error in that order, combining them where appropriate.

### Assignment of Error No. I

**The Trial Court's decision to terminate Appellant's parental rights and grant permanent custody to the Wyandot County Job and Family Services is against the manifest weight of the evidence.**

### Assignment of Error No. II

**The Trial Court erred in granting permanent custody for the children because it was not in their best interest.**

---

[3] It appears that the trial court ordered the child support as calculated by CSEA without holding a hearing on Diane's written objection because her objection was filed outside the seven-day time limitation ordered by the trial court. (Case No. C 2102011, Doc. No. 118). This issue has not been raised on appeal.

[4] The fathers of H.M.K. and J.B.K., Marvin H. and Michael B., are not parties to this appeal.

{¶36} In her first assignment of error, Diane argues that the trial court's decision to award WCDJFS permanent custody of the children was against the manifest weight of the evidence, because she completed her case plan thereby purging her prior contempt, the GAL recommended that she have visitation with H.M.K. despite the grant of permanent custody, and the trial court relied upon its speculation of future problems to make its decision.

{¶37} In her second assignment of error, Diane argues that granting WCDJFS permanent custody of H.M.K. was not clearly and convincingly in the child's best interest. In particular, Diane argues that the trial court discounted her bond with H.M.K. and that she had completed her case plan.

{¶38} As an initial matter, we note that Diane's arguments concerning permanent custody, although they appear to relate to both children, must necessarily be limited to H.M.K. since the trial court granted WCDJFS permanent custody of H.M.K. only. Chris and Tara H. were granted *legal* custody of J.B.K., and the trial court granted Diane parental visitation rights. With that caveat in mind, we proceed to our analysis of these assignments of error.

{¶39} "[T]he right to raise a child is an 'essential' and 'basic' civil right," and a parent's right to the custody of his or her child has been deemed "paramount." *In re Murray*, 52 Ohio St.3d 155, 157, (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 (1972); *In re Hayes*, 79 Ohio St.3d 46,

48 (1997); *In re Perales*, 52 Ohio St.2d 89, 97 (1977). Therefore, parents "must be afforded every procedural and substantive protection the law allows." *Hayes* at 48.

**{¶40}** Except under certain circumstances, a public children services agency that has had temporary custody of a child for twelve or more months of a consecutive twenty-two month period must file a motion for permanent custody. R.C. 2151.413(D)(1). A trial court may grant the motion if the court determines, by clear and convincing evidence, that it is in the best interest of the child, and "[t]he child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *." R.C. 2151.414(B)(1)(d).

**{¶41}** To determine whether granting the agency permanent custody is in the best interest of the child, R.C. 2151.414(D) provides a non-exclusive list of factors for the trial court to consider:

(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(2)   The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(3)   The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;

(4)   The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(5)   Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶42}** Clear and convincing evidence is more than a preponderance of the evidence but not as much evidence as required to establish guilt beyond a reasonable doubt as in a criminal case; rather, it is evidence which provides the trier of fact with a firm belief or conviction as to the facts sought to be established. *In re Meyer*, 98 Ohio App.3d 189, 195 (3d Dist.1994), citing *Cincinnati Bar Assn. v. Massengale*, 58 Ohio St.3d 121, 122 (1991).

{¶43} Upon review, an appellate court "must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof." *Meyer* at 195, citing *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985). A reviewing court will not reverse a trial court's determination unless it is not supported by clear and convincing evidence. *Meyer* at 195, citing *Holcomb* at 368 and *In re Adoption of Lay*, 25 Ohio St.3d 41, 42 (1986).

{¶44} The history preceding WCDJFS' motion for permanent custody is important in this case. By the time WCDJFS filed the complaints, it had received multiple reports concerning Diane's failure to supervise her children beginning on September 11, 2003. (Complaint, Doc. No. 1, Statement of Facts, attached). To put it bluntly, Diane has a history of allowing men into her life that physically and sexually abuse her children—H.M.K. is not the first victim of Diane's negligent supervision. (*Id.*). H.M.K. is also not the first of Diane's children to have severe head lice. (*Id.*). Attached to the September 11, 2009 GAL report were multiple police reports involving Diane's failure to supervise J.B.K., a police report about a sexual assault that occurred against Diane's now emancipated daughter, Kayla, and multiple police reports for domestic violence against Diane in the children's presence, including one incident where a knife was used.

{¶45} At the June 28, 2011 hearing on WCDJFS' motion for emergency custody, Marvin H. testified that he is J.B.K.'s father, no relation to H.M.K., and

he is a convicted sex offender. (Tr. at 6-8). Marvin H. testified that he was convicted of gross sexual imposition after inappropriately touching his stepdaughter, who was under five years old at the time, while she was bathing. (*Id.* at 8-9). Marvin H. testified that, with Diane's consent, he continued to visit J.B.K. despite the trial court's order that the children have no contact with sex offenders. (*Id.* at 8). He testified that he also visited H.M.K. during these visits, which included three overnight visits at his home. (*Id.* at 12-13). Marvin H. testified that his girlfriend was staying with him during the overnight visits, though she does not regularly live with him. (*Id.* at 13-14).

{¶46} Diane admitted that she allowed Marvin H. to have companionship with J.B.K. despite the trial court's order otherwise. (*Id.* at 15-16). Diane also testified that she has been socializing with Mark Hoffman, though he was a friend not a boyfriend, and she denied dating a man named "Bill" before that. (*Id.* at 17). Diane testified that Hoffman, not Bill, attended H.M.K.'s softball games with her. (*Id.* at 18). When she was asked about whether Hoffman had ever been convicted of a sexual offense, Diane testified "[n]o. * * * Because he's got five kids." (*Id.*). When asked about whether Hoffman had ever been convicted of domestic violence, Diane testified, "I don't think he -- I don't think he'd hurt anybody." (*Id.*). Diane testified that her children met Hoffman when he helped her move, but she did not contact the agency to screen Hoffman. (*Id.* at 18-19). Diane testified

that H.M.K. has a Nintendo DSI, but she was unaware it had pornography on it. (*Id.* at 19-20).

{¶47} Brenda Hanawalt, the foster-mother, testified that H.M.K. and J.B.K. have been in her home since April 28, 2011, and H.M.K. had severe head lice when she first came. (*Id.* at 20-21). Hanawalt observed J.B.K. humping H.M.K. a few times; Hanawalt testified that J.B.K. grabbed H.M.K. by the waist and was "humping on her like a sexual thing." (*Id.* at 23). When Hanawalt asked the children how they learned this behavior, the children first indicated that J.B.K. walked in on his older sister and boyfriend having sex once. (*Id.* at 23). When it happened a second time, H.M.K. indicated that J.B.K. must have learned this behavior from her Nintendo DSI. (*Id.* at 23-24).

{¶48} After testimony concerning the pornography on the Nintendo DSI and humping incidents was introduced, the attorneys for mother and father moved for a continuance since WCDJFS' motion did not give notice of these issues for the hearing. (*Id.* at 24-29). The trial court granted the motion, allowing WCDJFS to amend its motion for a further hearing. (*Id.*).

{¶49} On October 18, 2011, the hearing continued on WCDJFS' amended motion and Hanawalt testified that H.M.K. was "pretty much sexually advanced," and H.M.K. was showing other children on the school bus pornography that she had in her Nintendo DSI. (Tr. at 11). Hanawalt testified that H.M.K. was

laughing when J.B.K. was humping her. (*Id.* at 12). Hanawalt further testified that, during the first week she was in the home and they went to the pharmacy for head lice treatment, H.M.K. was checking out different types of condoms at the store and talking to her about different gels and lubricants. (*Id.*). Hanawalt testified that J.B.K. is struggling academically in school, and does not understand rules. (*Id.* at 13). She further testified that H.M.K. talks to her mother about men and partying quite frequently. (*Id.* at 15). Hanawalt testified that Diane has used her cell phone during every visitation period she observed. (*Id.* at 16). She testified that Diane does not ask her about how the children are doing in school, but she thinks Diane talks to the children about school. (*Id.* at 17). Hanawalt testified that, about two to three weeks after H.M.K. arrived in her home, H.M.K. was having bed-wetting incidents and nightmares about fighting off Brad Russell, one of Diane's old boyfriends, from touching her. (*Id.* at 18-19).

{¶50} Kristina Renee Ratliff, the WCDJFS social worker assigned to the case, testified that the agency became involved after J.B.K. was discovered outside of the home several times due to lack of supervision. (*Id.* at 22-23). Ratliff testified that Diane allowed the children to stay at Marvin H.'s house, a convicted sex offender, even though she was not permitted to do so per court order. (*Id.* at 23-24). Ratliff testified that H.M.K. has not disclosed any inappropriate sexual behavior to her counselor; however, Ratliff testified that H.M.K.'s counselor

indicated that H.M.K. may have some underlying issues that she is not yet comfortable talking about. (*Id.* at 41). Ratliff testified that H.M.K., a ten-year-old girl, has been exposed to a great deal of sexualized behavior, including pornography on her Nintendo DSI. (*Id.*). Ratliff testified that H.M.K. is obsessed with impressing boys, and, for that reason, H.M.K. will need extra supervision. (*Id.* at 42). Ratliff testified that Diane talks to H.M.K. about men, which seems to be a huge focus for both Diane and H.M.K. (*Id.* at 49).

{¶51} On October 24, 2012, the trial court held a hearing on WCDJFS' motion for permanent custody of H.M.K. and motion to grant Chris and Tara H. legal custody of J.B.K. Salisa Lynn Halloway testified that H.M.K., now twelve years old, has been residing in her foster home since the beginning of March (2012). (Oct. 24, 2012 Tr. at 53, 55). Halloway testified that she lives with her boyfriend, Dave Boes, and her three sons, Cody, Colin, and Conner. (*Id.*). Halloway testified that H.M.K. stopped wetting the bed and having nightmares, though she started doing that again the week of the court hearing. (*Id.* at 54). Halloway testified that H.M.K. is doing better in school, though she continues to be about a year behind academically, despite their efforts at homework every night. (*Id.* at 54-55). Halloway testified that H.M.K. played softball in the summer, participated in "Midget Cheerleading," and now wants to participate in gymnastics. (*Id.* at 55). Halloway testified that H.M.K.'s visitation with her

mother has been "okay," though it has changed from supervised to unsupervised back to supervised visitation. (*Id.* at 56). She testified that H.M.K. still needs and wants to see her mother, though H.M.K. does not talk to her much about it. (*Id.*).

{¶52} On cross-examination, Halloway testified that her three boys are ages twelve, fifteen, and seventeen. (*Id.* at 57). She testified that the boys get along with H.M.K., though the older boys are rarely around the house due to their sports schedule and driving privileges. (*Id.*). Halloway testified that she is acting as H.M.K's mother figure while she is staying in the home, and Dave is trying to be a father figure for H.M.K., who has never had a father. (*Id.* at 58). Halloway and Dave have talked about adopting H.M.K. in the event adoption is an option, and H.M.K. asked them if they were adopting her. (*Id.* at 60). Halloway testified that she took H.M.K. for supervised visits with her mother almost every week, though some of the visits did not occur due to scheduling conflicts. (*Id.* at 60, 63). Halloway testified that most of the visits happened. (*Id.* at 63). Halloway testified that H.M.K. told her that during her last visit with her mother, her mother told her that she hopes H.M.K. picks her, so H.M.K. believed that the outcome of the case depended on her. (*Id.* at 63-64). Halloway denied observing H.M.K. exhibit any inappropriate sexual behavior or interest in condoms. (*Id.* at 65). Halloway also testified that H.M.K. has very limited, supervised time on Facebook, once or twice a week for fifteen to twenty minutes. (*Id.*).

{¶53} Ratliff testified that she is the ongoing caseworker for H.M.K. and J.B.K, and H.M.K. has been in WCDJFS' temporary custody since May 9, 2011. (*Id.* at 66, 82). Ratliff testified that, prior to the removal of the children, the agency had been involved with the family several times due to J.B.K. getting out of the home and roaming the community wearing only his underwear. (*Id.*). Ratliff testified that she encouraged Diane to remedy the situation, but nothing seemed to work, so the agency had to intervene. (*Id.* at 67). Ratliff testified that the agency developed a case plan to help Diane with parenting and financial skills, to help H.M.K. academically, and to ensure the children were not around any people with a history of violence or sexual abuse. (*Id.* at 67-68). Ratliff testified that Diane completed her parenting classes and attended one budgeting class after being strongly encouraged to do so. (*Id.* at 68). Ratliff testified that Diane has completed most of her case plan, but the agency is requesting permanent custody of H.M.K., because Diane failed to put those skill sets into practice and continues to allow dangerous people access to her children. (*Id.* at 69).

{¶54} Ratliff testified that she has been working with Diane for years, not months, and her biggest frustration with Diane is that she appears to put her boyfriends before her children. (*Id.*). Despite their multiple conversations on the subject, Diane continued to expose her children to men who have a violent history, some of which have been convicted of sexual offenses against children, which had

caused some of her children to be sexually abused, according to Ratliff. (*Id.* at 69-70). Ratliff testified that there were allegations that Diane's live-in boyfriend, Brad Russell, was sexually inappropriate with Diane's eldest daughter (not a party herein), and Diane allowed Russell to continue living in the home after the allegations, though they did eventually break up. (*Id.* at 70). After Russell, Diane moved into another man's home who was just a "friend" and stayed there for quite a while. (*Id.*). After she moved out of that residence, Diane brought another man—also just a "friend"—to one of H.M.K.'s dance performances, which was an extra visitation period for Diane and no one else. (*Id.* at 70-71). Ratliff testified that Diane was supposed to clear potential boyfriends with the agency. (*Id.* at 71). Ratliff testified that, after this man, Diane brought another man, who she introduced as a boyfriend, to H.M.K.'s softball game. (*Id.* at 72).

{¶55} Ratliff testified that Donald Mauck was living with Diane, though she is not sure how long Mauck lived with Diane because Diane hid the relationship from her. (*Id.*). Ratliff testified that the agency discovered that Mauck had been charged with disseminating sexually explicit materials to minors. (*Id.*). J.B.K. disclosed to Chris and Tara H. that, one time when Diane and the children were at Putt-Putt during an unsupervised visitation, Diane hid Mauck in the bathroom since she believed that Ratliff might be making an unannounced visit. (*Id.* at 73). Ratliff testified that, when Diane picked up H.M.K. at her foster

home to go to Putt-Putt, she went alone and then picked up Mauck later so no one would know that Mauck was going along. (*Id.* at 79). Ratliff testified that, when she confronted Diane about hiding Mauck from the agency, Diane admitted it was wrong but did it anyway. (*Id.* at 79-80). Ratliff testified that she and her supervisor, Rodney Traxler, confronted Diane about Mauck, and Diane stated that she did not think it was fair that she could not have a boyfriend like everyone else. (*Id.* at 73). Ratliff testified that Diane thought Mauck could be around her children since he was charged, but not convicted, of the criminal offense. (*Id.* at 74). Ratliff testified that Mauck's Facebook page has sexually explicit content, and amidst the photographs of partially-naked females was a photograph of a fully-clothed H.M.K. (*Id.*). Mauck and H.M.K. are Facebook friends, so H.M.K. would have access to these sexually explicit photographs, and Mauck's sexually explicit comment about having a threesome with another woman. (*Id.* at 75). Ratliff testified that Diane claimed that she was unaware of the content of Mauck's Facebook page. (*Id.* at 76). Ratliff testified that she found Diane's ignorance concerning, because she told Diane that, if she is going to have a relationship, she needs to investigate that person as much as possible and report any concerns she has to the agency for investigation. (*Id.*).

{¶56} Ratliff testified that, after Diane and the children left Putt-Putt and were still on visitation time, Diane allowed H.M.K. to go swimming at a friend's

house, unsupervised. (*Id.* at 80). Ratliff testified that the agency had had prior involvement with the friend's family. (*Id.*). According to Ratliff, during this time, H.M.K. went with her friend and two boys into a wooded area together for a walk. (*Id.* at 81). Ratliff testified that Diane stated that she never asked the friend's mother to supervise her daughter, which meant that H.M.K. was unsupervised for four hours during Diane's scheduled visitation time. (*Id.* at 81-82). According to Ratliff, this triggered the agency's filing of the motion to terminate Diane's unsupervised visitations with H.M.K. (*Id.* at 82). Ratliff testified that, during Halloween 2011 trick-or-treating with her children, Diane was accompanied by a female friend who was intoxicated. (*Id.* at 83). Ratliff testified that it was concerning that Diane was constantly bringing inappropriate people to her visitation time. (*Id.* at 85). Ratliff testified that Diane loves her children and that the visitations have gone well, overall, but Diane continues to expose her children to dangerous individuals and allows her children to do whatever they want to do. (*Id.* at 85-86). Ratliff testified that, in her six years as a caseworker, she has never been more frustrated with someone than Diane, because she has explained things to her so many times, and yet Diane either does not understand or ignores her. (*Id.* at 87). Although Diane has been completing her case plan, Diane continues to make poor decisions, like allowing the children to go with Marvin H. (*Id.* at 88).

Ratliff does not like to give up on a family, personally, but she did not feel there was anything more the agency could do for reunification. (*Id.* at 90).

**{¶57}** Ratliff testified that Marvin H. is J.B.K.'s father, and Marvin did not agree with the agency's decision to place J.B.K. in the temporary custody of Chris and Tara H. (*Id.* at 91-92). Ratliff testified that Marvin indicated that he was done with the agency if J.B.K. was placed with Chris and Tara H., and Marvin has not contacted her since the placement, despite her multiple efforts to reach him. (*Id.* at 92). She testified that Michael B. is H.M.K.'s father, but he has not contacted the agency with respect to her case. (*Id.* at 93). Ratliff testified that Diane is not currently dating Mauck, though she is dating another man she met from work, and Ratliff only found out about this new boyfriend through H.M.K. (*Id.*).

**{¶58}** Ratliff testified that the agency is only asking for permanent custody of H.M.K. since Chris and Tara H. are an appropriate legal placement for J.B.K., and no family member has come forward for H.M.K. (*Id.* at 95). Ratliff testified that Diane does not accept responsibility for her actions; instead, it is always someone else's fault, whether that is the agency, CASA, Marvin H., Chris H., etc. (*Id.* at 96-97). Ratliff testified that H.M.K. told her that she wanted her foster mother to adopt her, though later H.M.K. indicated that she did not want to talk to the judge about her wishes because she did not want to upset her mother. (*Id.* at 98). H.M.K. told Ratliff that she knew her foster mother would take better care of

her, but she did not want to hurt her mother. (*Id.* at 99). Ratliff testified that H.M.K. shoulders a heavy burden for a young girl, and that much of that stems from Diane treating H.M.K. more like a friend than a daughter. (*Id.*). Ratliff testified that J.B.K. goes back and forth regarding his placement—sometimes he states that he wants to be with his mommy; other times he states that Chris and Tara H. will take better care of him. (*Id.* at 100). Ratliff testified that she thinks some of it stems from the fact that Chris and Tara H. discipline J.B.K., so sometimes he is upset and holds a grudge. (*Id.*).

{¶59} On cross-examination, Ratliff testified that Diane interacts well during visitation, has "pretty much completed everything on the original Case Plan," has stable work, has completed parenting and budgeting classes, and has an appropriate house. (*Id.* at 101). Ratliff admitted that the agency moved for permanent custody primarily for two reasons: who Diane brings into the children's lives, and her lack of supervision of the children. (*Id.* at 101-102). Ratliff testified that, prior to his placement with Chris and Tara H., J.B.K. was placed with a foster mother, Brenda Hanawalt, for about a year. (*Id.* at 102). Ratliff testified that J.B.K. was not completely potty trained prior to his removal, and Brenda worked with J.B.K., who continued to have bed-wetting incidents. (*Id.*). Ratliff testified that, as Tara H. has indicated, J.B.K. responds better to males than he does females, and Brenda was a single mother. (*Id.*).

{¶60} Ratliff testified that the agency and Chris and Tara H. had a disagreement concerning who was responsible to ensure supervised visitation between J.B.K. and Diane, which caused Diane to miss two scheduled visitations. (*Id.* at 104-106). According to Ratliff, some of the supervised visitation had to be scheduled on weekends, and Chris and Tara H. felt like the agency should be responsible to transport J.B.K. for the visitation periods, not them. (*Id.* at 105). Ratliff testified that Chris spoke with her supervisor and they worked out the issue, which meant Ratliff was responsible for the transportation. (*Id.*). Ratliff testified that weekend visitations were difficult for the agency workers, and weekday visitation was generally all right, except when Diane would not show up. (*Id.* at 110). Ratliff denied that the agency's failure to make weekend visitations work had anything to do with the fact that the motion for permanent custody had already been filed. (*Id.* at 111). Ratliff testified that all of the scheduling conflicts had already been set in motion prior to the decision to file for permanent custody. (*Id.*).

{¶61} Ratliff testified that she conducted a background check on Diane's current boyfriend, which did not reveal any criminal history. (*Id.* at 112). Ratliff testified that Diane was also a Facebook friend with Mauck, and Mauck also had pictures of Diane on his Facebook page. (*Id.* at 115). Ratliff testified that J.B.K. is more bonded with Diane than H.M.K. is at this point, and H.M.K. is "almost

kind of removing herself from that bond just because I think that she knows that she's better off where she is." (*Id.* at 116).

{¶62} Ratliff testified that visitation has been difficult to schedule, in part, due to Diane's work schedule since she works second shift and some weekends, too. (*Id.* at 117). She testified that Diane has made efforts to see H.M.K. cheerleading and playing softball, and attended a car show with H.M.K. (*Id.*). Ratliff testified that she does not think Diane's issue stems from her inability to care for two children at the same time; rather, Diane continues to make bad choices, not following rules that put her children in potentially harmful situations. (*Id.* at 120-121). Ratliff testified that Diane has never asked her about the children's academic progress, though she would occasionally ask J.B.K. about his school behavior. (*Id.* at 121). She further testified that Diane failed to enroll J.B.K. in Head Start, which was part of the Case Plan, and J.B.K. is repeating kindergarten. (*Id.* at 122). Ratliff testified that H.M.K. has made some progress in school, and her foster mother has been working with her on her homework. (*Id.* at 123).

{¶63} Ratliff testified that she was concerned about the four hours of unsupervised time H.M.K. spent at her friend's house since she was in the woods with boys, and H.M.K. is highly sexualized for her age. (*Id.* at 123-124). Ratliff testified that, after her time in the woods, H.M.K. returned with scratches all over

her legs and, particularly, on her knees. (*Id.* at 124). Ratliff testified that H.M.K. revealed to her that Diane has been recently telling her not to have a boyfriend, though she would tell her otherwise in the past, and H.M.K. told Ratliff that she thinks her mother was just saying this to impress the agency. (*Id.* at 125). Ratliff testified that she is concerned with Diane's lack of supervision of H.M.K. and because of her highly sexualized behavior H.M.K. is going to get pregnant. (*Id.*). Ratliff testified that Diane has taught H.M.K. that rules can be disobeyed, and H.M.K. has learned to lie about ridiculous things. (*Id.* at 126). Ratliff testified that Diane and H.M.K. have had conversations much like two girlfriends would have—about boys, people getting divorced, and people cheating on each other. (*Id.*).

{¶64} Ronette Kate Smith-Cheney, the GAL, testified that she filed a report in this case, and her opinion is the same as reflected in her report (to grant WCDJFS' permanent custody of H.M.K. and to grant Chris and Tara H. legal custody of J.B.K.). (*Id.* at 128-129). On cross-examination, Smith-Cheney testified that she would like to see H.M.K. have some contact with her mother, as she wishes; however, Smith-Cheney acknowledged that there is only so much they can control after adoption. (*Id.* at 130-131). She testified that she recommends that Chris and Tara H. be granted legal custody of J.B.K., and that he have visitation with Diane. (*Id.* at 131-132). Smith-Cheney testified that Diane did not

have any regard for court orders, and she is concerned that H.M.K. will either become pregnant or be molested by someone in the home. (*Id.* at 136). She testified that she was concerned about J.B.K.'s safety since he was getting out of the house and was running towards the street. (*Id.* at 137). Smith-Cheney testified that, even if the trial court could not guarantee that the children have continued contact with Diane, that fact would not change her recommendations. (*Id.* at 139).

{¶65} Diane K. testified that she has worked at Bucyrus [Precision] Technology making shafts for Honda transmissions for over a year. (*Id.* at 142). Diane testified that she is currently working second shift, but by the first of the year, the plant is moving to a three days on, three days off schedule, which will enable her to work from 6:30 a.m. to 6:30 p.m. three days per week. (*Id.* at 143). She testified that the three days on would rotate requiring her to work some weekends. (*Id.* at 144). Diane testified that, since she has a better job, she can afford to hire a babysitter, a woman who is a registered nurse, to watch the children after school and take them to their extracurricular activities on the days she is working. (*Id.* at 145). Diane testified that she has lived in Nevada (Ohio) for the past two years, but she recently put an offer on a farmhouse in Crestline, Ohio, and she is supposed to close the deal by November 15th (2012). (*Id.* at 146). Diane testified that the house has three bedrooms, one and a half baths, and has a large yard. (*Id.* at 147). Diane testified that she completed parenting classes

and had been implementing the new parenting skills a few weeks before J.B.K. was removed, and he was responding well. (*Id.*). Diane testified that she wants her children to be safe and she needs to monitor who comes to her home; she further testified that she needs to discipline the children even if it makes them mad. (*Id.* at 148). Diane testified that she asked the foster mother about the children's academic progress regularly, and she requested reports from the schools last year. (*Id.* at 149). She also testified that she spoke to the children all the time about their schooling. (*Id.*).

{¶66} Diane testified that she was unable to visit J.B.K. for three weeks since her car broke down, and she was unable to see J.B.K. another three weeks due to the disagreement between the agency and Chris and Tara H. regarding transportation. (*Id.* at 150). She testified that she was informed J.B.K. is taking medication, and Diane testified that she did not want her children to be on medication since it could damage their liver. (*Id.* at 151). Diane testified that she preferred talking with J.B.K. rather than giving him medication, and Diane attributed J.B.K.'s behavioral problems with his removal from the home and from one school to another. (*Id.*). Diane testified that she is no longer seeing Mauck due to his inappropriate posts on Facebook, of which she was previously unaware and did not discover until the agency notified her. (*Id.* at 152, 154). Diane testified that she has spent little time on Facebook since February (2012) since she

works seven days a week. (*Id.* at 153). Diane testified that she was unaware of how many Facebook friends H.M.K. has, and she removed Mauck from her Facebook friends' roster a couple weeks after she learned of the inappropriate content he had on his Facebook page. (*Id.* at 153, 155).

{¶67} Diane testified that "Oribringer" is her new boyfriend she met through work, and she had the agency check him out after she had one date with him. (*Id.* at 155). Diane testified that Oribringer raised two boys and said he would be willing to help raise her children so they could have a stable home. (*Id.*). Diane testified that "[i]t would totally tear [her] apart if [she] lost [her] kids altogether." (*Id.* at 156). She testified that the children would be devastated to lose her as well. (*Id.*). When asked about her failures to keep the children safe, Diane testified that that was the past, and she is trying to better her life, and she has found a responsible babysitter, which she blamed as the cause of the agency's initial involvement. (*Id.* at 156-157). Diane testified that she has made extra efforts to be involved in H.M.K.'s life, including attending softball games, cheerleading, and dance recitals, and even visited with H.M.K. when the agency was unable to supervise. (*Id.* at 157). Diane testified that H.M.K. was not unsupervised for four hours at her friend's house; rather, H.M.K. checked in with her every half-hour. (*Id.* at 158). Diane testified that she and her children moved in with one male friend, Nutter, only because she was laid off six times in the last

seven years, and she did not want to go on welfare to support her family. (*Id.* at 159).

{¶68} On cross-examination, Diane testified that she is buying the house with her new boyfriend, who she has known for six months and has been dating since September (2012). (*Id.* at 161-162). Diane testified that she met Mauck through Yearbook, which is an online social networking site similar to Facebook, and spoke to him for about a month before she began dating him. (*Id.* at 162-163). She testified that she met Mauck, and a few weeks later he moved into her home, and he lived there from February to May. (*Id.* at 163). Diane testified that she asked Mauck if he had any sexual offenses, and Mauck said "no." (*Id.* at 164). Diane testified that Mauck did not work, but he kept the house clean and mowed the yard in exchange for living at the house. (*Id.*).

{¶69} Diane testified that the school sent her copies of her children's report cards, but she never had direct contact with the teachers. (*Id.* at 164-165). Diane did not know the names of the children's school teachers. (*Id.* at 165). Diane testified that she disciplined J.B.K. by restricting his access to movies and sitting him in a chair. (*Id.* at 166). Diane testified that she spanked her children a few times when they really needed it, but not every time they disobeyed, because she did not want to hurt her children. (*Id.*). Diane testified that she learned the value

of honesty with her children through the parenting classes, and she is honest with her children. (*Id.* at 167).

{¶70} Diane testified that Mauck was not hiding in the restroom at Putt-Putt, but that he had to use the restroom, and she was joking around about him hiding in front of the children, which she testified she should not have done. (*Id.* at 168). Diane testified that, prior to the hearing, she told H.M.K. that she did not want to lose her, and that H.M.K. might be adopted and she would never see H.M.K. again. (*Id.* at 169). Diane admitted that this probably burdened H.M.K., but H.M.K. needed to know what could happen. (*Id.*).

{¶71} Diane testified that Ratliff has tried to support her and help keep the children in the home. (*Id.* at 170). She testified that she never left the children alone with Mauck. (*Id.* at 174). Diane identified WCDJFS' exhibit two as a screen shot from Mauck's Facebook page. (*Id.* at 176). Exhibit two contains a photograph of a woman with her legs open exposing her underwear upon which the words "ALL YOU CAN EAT" appear on the front. (*Id.* at 179); (WCDJFS' Ex. 2). The exhibit also contains a post with the following question, "If you could change something about your life, what would it be and why?" (Oct. 24, 2012 Tr. at 179.). Mauck's response to this question was "id [sic] have a good looking bi woman for me and my girl[.]" (*Id.*). Diane testified that, after she verified these things were on Mauck's Facebook page, she confronted Mauck and told him to

remove them because they were inappropriate. (*Id.* at 178). Diane also testified that she remembered "the birthday girl" on Mauck's Facebook page, which Diane identified as the photograph of a young naked woman holding a birthday cake, with birthday hats covering her breasts and a bow on her genital area, depicted on WCDJFS' exhibit three. (*Id.* at 181). Diane admitted that Mauck's Facebook postings were a problem, but she testified that she did not have time to monitor his internet usage since she was working seven days a week. (*Id.* at 182). Diane identified WCDJFS' exhibit four as a photograph of H.M.K. that was on Mauck's Facebook page, which Mauck probably took from H.M.K.'s Facebook page after they became Facebook friends. (*Id.* at 183). Diane testified that Mauck was charged with "disseminating matter to a minor off of one of his old cell phones," but she was not alarmed because Mauck never tried to be alone with H.M.K. and he was not convicted. (*Id.* at 186). Diane testified that she never allowed Mauck to babysit her children. (*Id.* at 187).

{¶72} Diane testified that she did not want her children on drugs, like Ritalin, to address their behaviors, because the drugs have serious side effects. (*Id.* at 188). Diane testified that she did not feel responsible for the fact that J.B.K., now six years old, was not fully potty trained. (*Id.* at 189). When asked if she felt any responsibility for J.B.K. needing to repeat kindergarten, Diane testified that it was a little bit of the agency's fault for removing J.B.K. from his

old school and a little bit of her fault since she did not enroll him into preschool, though she tried to at four places unsuccessfully. (*Id.* at 190). Diane also blamed H.M.K.'s decline in school to the fact that she was now attending a new school, and the agency has "uprooted" her life. (*Id.* at 191-192). Diane testified that her bad decision-making was in the past, she finished her case plan, and she was now trying to better her life. (*Id.* at 194, 199).

{¶73} After reviewing the aforementioned testimony in light of the history of the case and the GAL reports, the trial court determined that granting WCDJFS permanent custody of H.M.K. was in her best interest and that H.M.K. cannot be placed with either of her parents.[5] With respect to the latter finding, the trial court noted that H.M.K.'s father, Michael B., has shown absolutely no interest in the proceedings, and, Diane has failed to remedy the conditions which caused H.M.K. to be removed from the home. (Nov. 28, 2012 Entry, Doc. No. 97). The trial court acknowledged that Diane had completed the case plan goals, but that "compliance with the case plan, without more, does not entitle a parent to custody." (*Id.*, citing *In the Matter of McKenzie*, 9th Dist. No. 95CA 0015 (Oct. 18, 1995)). The trial court expressed its concern that Diane fails to supervise H.M.K. who is a highly sexualized young girl who has already exhibited sexual behaviors. (*Id.*). The trial court found that Diane was unable to put H.M.K.'s

---

[5] Although this latter finding was supported by the record, it was not necessary in this case since H.M.K. had been in WCDJFS' temporary custody for twelve consecutive months out of a twenty-two month period. *Compare* R.C. 2151.414(B)(1)(a), (B)(1)(d).

supervision above her own need to have male companionship. (*Id.*). Diane, according to the trial court, has brought H.M.K. into an adult world and made her a co-conspirator in keeping Diane's secrets. (*Id.*). The trial court found that, instead of protecting H.M.K. after being alerted to her highly sexualized nature, Diane allowed her to live with and Facebook "friend" Mauck, who had several pictures of scantily clothed and naked women on his Facebook page, amongst which appeared a photo of H.M.K. (*Id.*).

{¶74} Diane argues that the trial court's decision was against the manifest weight of the evidence because she completed her case plan. Although Diane reluctantly completed a majority of her case plan, she failed to complete very critical case plan goals. For example, one of the case plan goals required Diane to provide H.M.K. with proper supervision at all times and to have anyone supervising the children screened by the agency. (Amended Case Plan, Doc. No. 41). The record indicates that Diane allowed H.M.K. to be around multiple men who were not previously screened by the agency, and Diane allowed H.M.K. to spend several hours at a friend's house where H.M.K. was not properly supervised and took a "walk" in the woods with several young boys. While H.M.K. alleged that nothing happened, it is at least questionable given her high level of curiosity with sex, her exposure to pornography, and the multiple scratches located on her

knees. The GAL reported that this friend's father was a registered sex offender. (Sept. 9, 2011 GAL Report).

**{¶75}** Many of the men Diane allowed near H.M.K. either had sexually-related convictions or charges, and H.M.K. had nightmares about one of Diane's live-in boyfriends (Brad Russell) inappropriately touching her, which raises an implication that something may have actually occurred—something H.M.K.'s counselor suggested and something that H.M.K.'s older sister, Kayla, alleged. (Sept. 13, 2010 GAL Report). Diane allowed H.M.K. to be supervised by Marvin H.—a sexual offender whose offense involved a young female like H.M.K.—in violation of the trial court's order. The case plan specifically required Diane to keep the children away from individuals with sexual or violent offenses. In addition to being a sex offender, Marvin H. was convicted of disorderly conduct. (Oct. 18, 2011 Tr. at 96).

**{¶76}** Another case plan goal required Diane to remove H.M.K. from all social media websites, except one, and to ensure that H.M.K.'s age was appropriately listed on the website. (*Id.*). While Diane may have followed the letter of this goal, she certainly did not fulfill its spirit, which was to protect H.M.K. while she was on social media websites. Instead, Diane allowed H.M.K. to have unmonitored Facebook usage where she was exposed to Mauck's

inappropriate Facebook photographs and his sexual remarks.[6]  Simply clicking on Mauck's Facebook page (a five-minute task, at most) would have alerted any reasonable mother to the danger Mauck posed to a young girl like H.M.K.  Diane also failed for several weeks to ensure that H.M.K. friended an agency worker so that her activity could be monitored.  Diane did not just allow Mauck—who was charged with disseminating sexual material to a minor—to be Facebook friends with H.M.K.; rather, Diane allowed Mauck to live in the home with her children while she worked many hours outside of the home.  While Diane claimed that Mauck was never alone with the children, this is highly doubtful given Diane's past negligent supervision.  While Diane did encourage and attend H.M.K.'s extracurricular activities as required under the case plan, she showed minimal interest in H.M.K.'s academic progress, only requesting report cards once.  Diane was unable to provide the name of her children's teachers, and she failed to meet with them.

{¶77} Diane argues that the GAL recommended that H.M.K. have continued contact with Diane despite recommending that the trial court grant WCDJFS' motion for permanent custody.  While it is true that the GAL testified that H.M.K. wants and would benefit from some limited, supervised contact with

---

[6]  It appears that Mauck's Facebook comments about having a bisexual woman for him and his girlfriend occurred when Mauck was living with Diane as her boyfriend, implicating Diane, H.M.K.'s mother, in this sexual debauchery. (*See* Oct. 24, 2012 Tr. at 76, 177-178).  The implication that her mother would engage in a three-some with another female could have had devastating effects on H.M.K.  Regardless of the timing of the comment, it only exacerbates H.M.K.'s sexual curiosity, which is wholly inappropriate for a girl her age.

Diane in the future, the GAL admitted that that issue may not be within the agency's control after H.M.K. is adopted. (Oct. 24, 2012 Tr. at 131-132); (Oct. 17, 2012 GAL Report). The GAL also testified that, even if H.M.K. cannot continue to have contact with Diane, she still recommends granting the motion for permanent custody. (Tr. at 139).

{¶78} The GAL Reports in this case strongly support the trial court's grant of permanent custody. In her September 13, 2010 report, the GAL indicated that Diane blamed the agency's involvement on her older daughter, Kayla, for failing to supervise J.B.K. while she was working. This confirmed Ratliff's testimony that Diane repeatedly blamed others for the problems in her family. Diane also reported that she, Kayla, H.M.K., and J.B.K. were all residing at her friend Andy Nutter's home since she lost her previous job. Diane reported that her other daughter, Tori (age 14), has been in the custody of her father and his new wife for two years. She reported that Michael B., H.M.K.'s father, was recently released from prison for a domestic violence conviction (meaning he has had multiple domestic violence convictions), and he had been convicted of several sexual offenses prior to 1997. Kayla indicated that her mother's boyfriend, Brad Russell, who lived in the home from 2007 to April 2010, had molested and physically abused her and H.M.K. for years. The school counselor indicated that H.M.K. dresses inappropriately, and H.M.K. repeats what her mother does with men

behind closed doors to boyfriends at school. She also revealed that H.M.K. had bruises and cuts on her body from Russell.

{¶79} On October 12, 2010, the GAL reported that H.M.K. stated that she, her mother, and J.B.K. were moving in with Michael B., who has a history of criminal drug abuse, domestic violence, and sexual imposition. In the September 9, 2011 report, the GAL indicated that she investigated the home of H.M.K.'s friend, and discovered that the friend's father was a registered sex offender. The GAL also reported that Diane allowed H.M.K. to invite a boyfriend to the softball picnic unbeknownst to the foster-mother. Attached to the report were multiple police reports involving Diane's failure to supervise J.B.K., which led to WCDJFS' involvement, a police report about a sexual assault that occurred against Kayla, and police reports concerning multiple domestic violence incidents where Diane was a victim, including one incident where a knife was used.

{¶80} On October 17, 2012, the GAL reported that Diane continued to have a relationship with Mauck even after Ratliff indicated that WCDJFS was going to seek permanent custody of H.M.K. The GAL further reported that, in the summer of 2012, Mauck was indicted for felony assault on a paramedic after feigning a heart attack. The GAL recommended that the trial court grant WCDJFS permanent custody of H.M.K. with the goal of finding a suitable foster/adoptive placement that would facilitate visitation between H.M.K. and Diane.

**{¶81}** Diane also argues that the trial court ignored the fact that she purged her contempt and inappropriately relied on speculation about future problems. The trial court's judgment entry clearly refutes these claims. The trial court noted that Diane was permitted to purge her contempt, but the trial court found disturbing that Diane was more motivated to complete her case plan goals by a potential jail sentence than the loss of her children. (Nov. 28, 2012 Entry, Doc. No. 97). The trial court's judgment entry does not speculate about future events; it explains Diane's failure to put her children's well-being above her own desires.

**{¶82}** Finally, Diane argues that the trial court failed to account for the fact that WCDJFS failed to modify the case plan in order to reunify the family. As the trial court found, WCDJFS made more than reasonable efforts toward reunification in this case. The original complaints were filed in August 2010; the trial court granted WCDJFS' permanent custody of H.M.K. in November 2012, more than two years later. In the interim, Diane was given multiple opportunities to achieve reunification, and the case plan was modified multiple times. (Doc. Nos. 42, 54, 78). Despite WCDJFS' reasonable efforts, Diane continually made bad choices, usually involving men, which jeopardized the reunification process. Even after Diane violated the trial court's order that she keep the children away from sex offenders and violent persons, the agency, over the GAL's objection, moved the trial court to grant Diane unsupervised visitation, and the trial court,

though reluctant, allowed the same. (Doc. Nos. 71-72, 77). Yet, when given this opportunity, Diane failed to properly supervise H.M.K.'s Facebook activity and allowed her to go to a friend's house to swim with young males, where the friend's father was a sexual offender. Ratliff testified that, over the course of the past two years, she has been very frustrated with Diane because, despite her best efforts, Diane still chooses to place men above the well-being of her children. Even after WCDJFS filed for permanent custody, Diane was in the process of purchasing a home with a new man she had known for "over six months" and had dated for one month, with the idea that he was going to be a father-figure for her children.[7]

{¶83} After reviewing the entire record herein, we hold that the trial court's decision to grant WCDJFS permanent custody of H.M.K. was clearly and convincingly in H.M.K.'s best interest and not against the manifest weight of the evidence.

{¶84} Diane's first and second assignments of error are, therefore, overruled.

### Assignment of Error No. III

**The trial court's dispositional order of relative placement for [J.B.K.] was against the manifest weight of the evidence.**

---

[7] We make no observation concerning the man's character beyond the fact that he, too, thought buying a house with Diane after dating her for a couple months was wise; rather, we observe the fact that Diane thought it advisable to purchase a house with a new boyfriend she had been dating only for a couple months, at most, and to invite her children into that home. These decisions, like many before, demonstrate that Diane lacks the foresight to protect her children and continually thinks of her desire to be in a relationship first and her children's well-being second.

{¶85} In her third assignment of error, Diane argues that the trial court's order granting Chris and Tara H. legal custody of J.B.K. was against the manifest weight of the evidence, because she completed her parenting classes and J.B.K. was responding better to her new skills; she broke off her relationship with her boyfriend after she discovered his Facebook page; she has a close bond with J.B.K.; she purged her contempt; and, she allowed J.B.K. to visit his father, Marvin H., because she confused orders from two different cases.

{¶86} "A juvenile court has broad discretion in the disposition of an abused, neglected, or dependent child." *In re C.W.*, 3d Dist. No. 16-09-26, 2010-Ohio-2157, ¶ 10, citing R.C. 2151.353(A); Juv.R. 34(D). A reviewing court will not reverse the trial court's dispositional decision as being against the manifest weight of the evidence if it is supported by competent, credible evidence. *In re C.W.* at ¶ 11 (citations omitted).

{¶87} Among the trial court's dispositional options is granting legal custody of the minor child to a person identified in the complaint or in a motion filed prior to the dispositional hearing. R.C. 2151.353(A)(3). Whether the trial court is issuing its first disposition or modifying its disposition, the best interest of the child is the trial court's primary consideration. *In re C.W.* at ¶ 11 (citations omitted); R.C. 2151.42(A). The trial court must also consider which situation will best promote the child's "care, protection, and mental and physical development"

understanding that a child should be separated from his family environment "only when necessary for the child's welfare or in the interests of public safety." *In re C.W.* at ¶ 11, citing R.C. 2151.01(A).

{¶88} R.C. 2151.353 does not provide factors that the court should consider for determining the child's best interests in a request for legal custody. *In re E.A.*, 8th Dist. No. 99065, 2013-Ohio-1193, ¶ 13, citing *In re G.M.*, 8th Dist. No. 95410, 2011-Ohio-4090, ¶ 16; *In re Pryor*, 86 Ohio App.3d 327, 336 (4th Dist.1993). While not specifically required, to determine the best interest of a child for purposes of R.C. 2151.353(A)(3), trial courts may be guided by the factors listed in R.C. 3109.04(F)(1) or 2151.414(D). *In re G.M.*, 2011-Ohio-4090, at ¶ 15 (either set of factors can be applied); *In re Metz/Fonner*, 5th Dist. No. 2007CA00175, 2008-Ohio-1390, ¶ 42-46 (applying factors from both sections); *Pryor*, 86 Ohio App.3d at 336 (applying R.C. 3109.04(F)(1) factors); *In re Bradford*, 10th Dist. No. 01AP-1151, 2002-Ohio-4013, ¶ 49 (same); *In re Memic*, 11th Dist. Nos. 2006-L-049, 2006-L-050, and 2006-L-051, 2006-Ohio-6346, ¶ 26 (same); *In re K.B.*, 12th Dist. No. CA2012-03-063, 2013-Ohio-858, ¶ 11 (same); *In re E.A.*, 2013-Ohio-1193, at ¶ (applying R.C. 2151.414(D) factors); *In re T.A.*, 9th Dist. No. 22954, 2006-Ohio-4468, ¶ 17 (same). *See also In re Bixler*, 3d Dist. Nos. 13-05-41 and 13-05-42, 2006-Ohio-3533, ¶ 25, fn. 1 (R.C. 3109.04 is sufficient to make best interest determination since Chapter 21 does not provide a

definitive standard). Quite frankly, the differences in the best interest factors in these two provisions are of little consequence, since the factors are merely instructive on the question of a child's best interests. *In re G.M.*, 2011-Ohio-4090, at ¶ 16.

{¶89} Although the trial court herein did not cite which best interest factors it applied—those outlined in R.C. 3109.04 or 2514.414(D)—the trial court's analysis suggests it considered those factors listed in R.C. 2151.414(D). (Nov. 7, 2012 JE, Doc. No. 118). The trial court noted many of the same concerns it had with Diane in H.M.K.'s case in J.B.K.'s case—most of those concerns stemming from Diane's inability to place her children's needs, even the most basic need of adequate supervision, above her need for male companionship. (*Id.*).

{¶90} The trial court observed that WCDJFS' initial involvement stemmed from Diane leaving H.M.K., a ten-year-old, in charge of supervising J.B.K., a four-year-old, and H.M.K. allowing J.B.K. to escape from the home. (*Id.*). The trial court noted that J.B.K., now six years old, is not properly potty trained, has disobedience problems, and struggles academically, which is due, in part, to Diane's failure to ensure J.B.K. was enrolled in Head Start, per the case plan. (*Id.*). Diane was unable to name the school J.B.K. attends or his teacher. (*Id.*). The trial court found troubling not Diane's decision to forgo medication to address J.B.K.'s behavioral problems; but rather, Diane's failure to implement the

alternative strategy she articulated for dealing with J.B.K.'s behavioral problems. (*Id.*). The trial court also found troubling Diane's decision to purchase a home in October with a new boyfriend who she started dating in August—a man that had not been screened by the agency and whom Diane intended to be a father-figure for the children. (*Id.*). The bottom line, according to the trial court, was that once Diane "expends the energy necessary to keep her job and the energy necessary to obtain and maintain a relationship with a man, she has nothing left to offer [J.B.K.]." (*Id.*). The trial court noted Chris and Tara H. are willing to help J.B.K. and have provided him with the attention and discipline he deserves, and J.B.K. is progressing in this stable and safe environment. (*Id.*).

{¶91} Upon review of the entire record herein, we cannot conclude that the trial court abused its discretion by awarding Chris and Tara H. legal custody of J.B.K. nor was the trial court's decision against the manifest weight of the evidence. In addition to the testimony above with respect to H.M.K. which is relevant here, it was noted several times by case workers and foster parents, alike, the lack of supervision that Diane provided J.B.K. During several of the supervised visitation periods, Diane failed to properly supervise J.B.K. while she was busy talking or texting on her cell phone or talking to park patrons—time she should have spent visiting and supervising her children. (Oct. 24, 2012 Tr. at 136-137); (Oct. 18, 2011 Tr. at 15-16, 44-46, 53-55, 74-76); (Sept. 9, 2011 GAL

Report) (during the July 14, 2011 visitation, Diane spent 45 minutes talking to a friend rather than supervising/visiting J.B.K.); (during Aug. 11, 2011 visit, Diane was talking with a male park patron on bicycle for over 45 minutes; Kayla spent more time with J.B.K. than Diane); (Oct. 12, 2011 GAL Report) (during October 18, 2011 visit, Diane failed to supervise J.B.K. while he was kicking at other children who were attempting to go down the slide; and then, J.B.K. ran down the steps of the slide rather than sliding down the slide).[8]  Diane failed to take an interest in J.B.K.'s academic success and failed to provide him with proper discipline that further exacerbated his academic difficulties.  J.B.K. was also exhibiting sexualized behavior in the first foster home, and Diane's track record with her other children, including those not parties to this case, is concerning for J.B.K.'s future.  Diane failed to provide J.B.K. with proper discipline, as well, which affected his academic performance.

{¶92} Diane's arguments are meritless.  As we have already mentioned, she did not complete the most important case plan goals, as she alleges.  Diane's excuse for allowing Marvin H. visitation with J.B.K.—that she confused orders from two different cases—is not credible since she acknowledged in open court that she knew the children were not supposed to be around sexual offenders.  (June

---

[8] The incidents from the GAL reports are not exhaustive but merely illustrative—to list all of the incidents of Diane's failed supervision would take several pages.  This is especially troubling given that Diane knew she was being monitored during these visits and yet still failed to adequately supervise J.B.K. subjecting him to very serious dangers, including automobile traffic on several instances.

28, 2011 Tr. at 12-13); (Oct. 18, 2011 Tr. at 52). Besides that, even if Diane was confused about Marvin H.'s visitation rights with respect to J.B.K., that does not explain why she allowed Marvin H. to visit H.M.K., with whom he had no relationship or familial connection, for an overnight visit. (*Id.*); (*Id.* at 23-24, 51-52, 95). Finally, Diane argues that she ended her relationship with Mauck after the agency revealed to her the inappropriate content on his Facebook page. This argument misses the mark, too. Diane tends to make the right decisions when she is forced to do so, but she failed repeatedly to be proactive to protect the children in the first place. The fact that Diane is playing house again with a man she met six months ago without previously screening this man through the agency demonstrates that she has not learned from her past mistakes but perpetually repeats them. The trial court's decision to grant Chris and Tara H. legal custody of J.B.K. was supported by the record and not an abuse of its discretion.

{¶93} Diane's third assignment of error is, therefore, overruled.

### Assignment of Error No. IV

**The Wyandot County Job and Family Services failed its duty to use reasonable case planning and diligent efforts at reunification.**

### Assignment of Error No. V

**The Wyandot County Job and Family Services did not make a good faith effort to reunify the Appellant with her children.**

**{¶94}** In her fourth and fifth assignments of error, Diane argues that WCDJFS failed to make reasonable efforts and amend the case plan to achieve reunification.[9]

**{¶95}** R.C. 2151.412 requires the agency to develop case plans with the general goal of reunification. R.C. 2151.419 requires that the trial court find at the adjudication that the agency has made reasonable efforts to return the child to the child's home or was not required to do so. "Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification." *In re D.A.*, 6th Dist. No. L-11-1197, 2012-Ohio-1104, ¶ 30 (citations omitted). "'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *In re M.A.P.*, 12th Dist. Nos. CA2012-08-164 and CA2012-08-165, 2013-Ohio-655, ¶ 47, citing *In re K.L.*, 12th Dist. No. CA2012-08-062, 2013-Ohio-12, ¶ 18.

**{¶96}** The record in this case demonstrates that the agency made reasonable efforts toward reunification. As previously highlighted, the case plans were amended multiple times to address Diane's issues. (Case No. C 2102010, Doc.

---

[9] Assignment of error five on page 16 of Diane's brief states "CPSU did not have make [sic] a good faith effort to reunify the appellant with *his* children." (Emphasis added). It appears that the word "his" is a typographical error and both the fourth and fifth assignments of error relate to Diane, the only party to this appeal.

Nos. 42, 55. 78); (Case No. C 2102011, Doc. Nos. 39, 60, 92). The agency, over the GAL's objection, requested that Diane be granted unsupervised visitations, and Diane failed to properly supervise the children during these unsupervised visitations. (*Id.*, Doc. No. 71); (*Id.*, Doc. No. 84). The agency also worked around Diane's busy work schedule to accommodate visitation periods, allowing her to exercise supervised visitation on several weekends. (Oct. 24, 2012 Tr. at 104-111). The agency provided Diane with parenting classes, budgeting classes, and counseling for her and her children. (*Id.* at 67-68). Still, Diane continued to make bad decisions subjecting her children to dangerous men.

{¶97} Ratliff, the social worker assigned to the cases, testified that "Diane appears to put boyfriends before her children. * * * She exposed them to men who have violent history, who have been convicted of sexual offenses against children. And * * * some of her children have been sexually abused." (Oct. 24, 2012 Tr. at 69). Ratliff further testified:

> I never had to explain things so many times to one person and then just continue to ignore everything I say. I don't know if it's ignoring me or just not getting it. I think she gets it. I think that she just chooses not to listen to me. I just don't know. We have given her so many opportunities to get her kids back and to work towards reunification. And it's like every step we take forward she makes us

take five steps back because of the decisions that she makes even though everything is in place for her to get her kids back.

I mean, she was doing her Case Plan and everything. She was doing what she needed to do, but then she has to go and make a poor decision of letting the children go with Marvin [H.], when it was very specific that they are not supposed to go there and she did it anyways. (*Id.* at 87-88).

{¶98} As Ratliff noted, no case plan modification or further counseling would have corrected the major problem in this case—Diane's decision to elevate her relationships with men over the well-being of her children. Despite the countless admonitions to change, Diane failed to do so, and, at some point, the children can no longer be victims of Diane's poor decision-making. Consequently, we cannot find that the trial court erred in determining that the agency made reasonable efforts toward reunification in this case.

{¶99} Diane's fourth and fifth assignments of error are, therefore, overruled.

{¶100} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgments of the trial court.

*Judgments Affirmed*

**WILLAMOWSKI and SHAW, J.J., concur.**

**/jlr**