[Cite as *In re B.S.*, 2015-Ohio-4805.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

IN RE:                                                    CASE NO. 1-15-44

   B.S.

**ADJUDICATED DEPENDENT**
**CHILD.**                                              **O P I N I O N**

[REBECCA S. - APPELLANT]

Appeal from Allen County Common Pleas Court
Juvenile Division
Trial Court No. 2014 JG 31328

**Judgment Affirmed**

Date of Decision:  November 23, 2015

APPEARANCES:

   *Brian J. Vennekotter* for Appellant

   *Mariah M. Cunningham* for Appellee

**SHAW, J.**

{**¶1**} Mother-appellant Rebecca S. ("Rebecca") brings this appeal from the June 23, 2015 judgment of the Allen County Common Pleas Court, Juvenile Division, granting permanent custody of adjudicated dependent child "B.S." to the Allen County Children's Services Board ("ACCSB").

{**¶2**} The facts relevant to this appeal are as follows. B.S. was born prematurely in February of 2014 with a number of congenital medical problems and cranial facial deformities. He was born with Pierre Robin Sequence, "which is an airway and oral anomaly genetically * * * driven * * * requiring supplemental oxygen, [an] apnea monitor at birth" and frequent smaller feedings due to the increased risk of choking. (May 13, 2015, Tr. at 7-8). B.S.'s specific issues related to Pierre Robin Sequence included micrognathia, which was defined as an undersized jaw that can lead to difficulty swallowing and breathing, and ankyloglossia, which was defined as prohibiting movement of the tongue. B.S. also developed upper respiratory issues.

{**¶3**} While B.S. was in the hospital just after his birth, Rebecca and Robert S., B.S.'s father and Rebecca's husband, were observed by hospital personnel turning off B.S.'s monitor and not notifying hospital personnel when the alarm sounded. B.S. was also observed lying on his back when the parents were specifically advised not to allow it. Medical personnel feared that Rebecca and

Robert might not be competent to care for B.S. given his life-threatening conditions.

{¶4} Based on these facts the ACCSB filed an ex parte motion for emergency custody of B.S. On March 4, 2014, a shelter care hearing was held and B.S. was ultimately placed in the shelter care of the ACCSB.

{¶5} On March 4, 2014, the ACCSB filed a complaint alleging that B.S. was a dependent child. (Doc. No. 5). The trial court then appointed a Guardian ad litem for B.S. In addition, due to the cognitive limitations of Rebecca and Robert, a Guardian ad litem was appointed for each of them as well.

{¶6} On March 31, 2014, a case plan was filed wherein Rebecca and Robert were required to demonstrate that they could provide for B.S. They were also required, *inter alia*, to complete parenting classes and demonstrate the learned skills from those classes, and to submit to psychological assessments.

{¶7} On April 23, 2014, a magistrate conducted an adjudicatory hearing wherein the parties agreed that B.S. was a dependent child. The trial court reviewed the magistrate's decision finding that B.S. was dependent and determined that B.S. was a dependent child as defined in R.C. 2151.04(C).

{¶8} On May 7, 2014, a dispositional hearing was held wherein the magistrate determined that B.S. should be placed in the temporary custody of the ACCSB. On July 2, 2014, the trial court agreed with the magistrate's recommendation and placed B.S. in the temporary custody of the ACCSB.

{¶9} Pursuant to the case plan, psychological evaluations were performed of both Rebecca and Robert by Dr. Thomas Hustak. The evaluation determined that Rebecca had an IQ composite of 70, indicating that approximately 98% of people Rebecca's age were doing better intellectually and only 1% were doing worse. The evaluation indicated that Rebecca's verbal ability corresponded to that of a 10 year old and her nonverbal ability to that of an 8 year old. Rebecca was also considered "high risk" for being physically abusive.

{¶10} Similar to Rebecca, Robert also had an IQ composite of 70. In addition, the evaluation mentioned that Robert had previously been charged with Gross Sexual Imposition of a 6 year old boy, but when Robert's competency was evaluated to see if he could stand trial, he was found not competent to stand trial. Robert had also been found guilty of Domestic Violence against Rebecca, and Rebecca indicated that she was fearful of him at times.

{¶11} The psychological evaluation indicated that neither parent could identify B.S.'s problems or how they would deal with them. The evaluation also indicated that neither parent had the ability to anticipate problems that would arise as a result of parenting a child, particularly one with special needs.

{¶12} In summation, the evaluation contained the following information.

> **Sadly, one cannot fault either of these parents for their limited intellectual understanding. Their cognitive skills are genetic and developmentally based, not learned behavior. Therefore, they have their own developmental problems that are established by history and demonstrated in the present record. What is**

**problematic, however, is that this is not likely to get better over time because part of the major problem is developmental and, therefore, this is a static condition. You cannot expect them to grasp the full implications of how to manage a child when they can barely manage themselves.**

**Their developmental limitation is a condition of their living and is not going to get better with the passage of time. There will be "a ceiling" to improve, even with educational classes to enhance their skills. By definition, they will always be in a rather dependent situation with their child. Since neither parent can seem to control their own emotions historically and presently, one would have to conclude that they are placed into the category of High Risk parents. A child would also be considered a High Risk for physical abuse in this environment.**

**One would also have to anticipate that the child would be considered High Risk for "neglect," since the parents don't have a good understanding of the risk factors involved with their child and what will be needed to address those factors. One would conclude that some form of supervision, family aid, family training and education, and close monitoring will be a lifelong problem until they get older and the child grows to the point where the child can express their own needs at a much later age (i.e., age 10 on up). Until that time, a child placed in the care of Robert and Rebecca Smith will be considered at high risk based upon the history, the present evidence, the personality testing, and the intellectual limitations.**

(ACCSB Ex. 1).

{¶13} On November 7, 2014, the ACCSB filed a motion requesting permanent custody of B.S. The motion indicated that the agency had made reasonable and diligent efforts to assist B.S.'s parents in remedying their issues but the parents had failed to substantially remedy those conditions that led to B.S. being taken.

{¶14} On May 6, 2015, a deposition was taken of Dr. Hustak, who had conducted the psychological evaluations of Rebecca and Robert. In his deposition Dr. Hustak further clarified his findings from his evaluation. Dr. Hustak testified that he was concerned with Rebecca and Robert's ability to care for themselves, let alone a child with special needs. Dr. Hustak testified that it is possible for someone of Rebecca and Robert's intelligence to parent a child; however, he testified that it would likely require a full-time caregiver or assistant to be present to oversee the situation and watch what was being done. (Hustak Depo Tr. at 43-44). Dr. Hustak testified that Rebecca would need "an awful lot of supervision" to be an effective parent.

{¶15} Dr. Hustak testified that Rebecca would have difficulty caring for a child because she has a difficult time remembering things and she was not really aware of how to take care of a child. Dr. Hustak testified, "[Y]ou can't fix something you don't recognize." (*Id*. at 11). Dr. Hustak further testified that Rebecca could not articulate what B.S.'s problems even were, minimizing any issues and stating that everything would be "fine." (Tr. at 12). Dr. Hustak also testified that his concerns for Rebecca in that regard were the same for Robert.

{¶16} On May 13-14, 2015, this case proceeded to a hearing on the ACCSB's motion for permanent custody. Although Rebecca attended the hearing, as did her GAL and Robert's GAL, Robert did not attend the hearing. At the hearing the parties stipulated that Dr. Hustak's deposition and his psychological

evaluation would be entered into evidence and could thus be considered by the trial court. The ACCSB then presented its case and began by calling Karen Martin, a pediatric nurse at Health Partners of Western Ohio who had been B.S.'s primary care provider since his birth. Martin testified to B.S.'s early health issues and his ongoing health issues, which now included asthma.

{¶17} Martin testified that B.S.'s breathing treatments required specific medication to be administered to B.S. via an aerosol mask. Martin also testified that B.S. would need reliable transportation to Columbus for his cranial facial evaluations, to his speech therapy and to his primary care visits. Martin also testified that B.S. would need constant supervision due to his condition for choking hazards. Lastly, Martin testified that B.S.'s foster mother had been bringing B.S. to all of his appointments and was meeting B.S.'s medical needs.

{¶18} The ACCSB next called Jessie Spencer, B.S.'s foster mother. Spencer testified that B.S. lived with her, her husband, and her three children. Spencer testified as to B.S.'s ongoing medical issues and what she does for them. Specifically, Spencer testified that B.S. has developmental delays, that she works with B.S. daily, and that B.S. has physical therapy weekly. Spencer testified that she has a good relationship with Rebecca and that Rebecca was cooperative when Rebecca exercised visitation. Spencer testified that B.S. was integrated with her family and that she would consider adopting B.S. if he was placed in the ACCSB's permanent custody.

{¶19} The ACCSB next called Mary Knippen, a "case aid" with the ACCSB. Knippen testified that she supervised B.S.'s visits with Rebecca and Robert. Knippen testified that Rebecca regularly attended for her visitation but Robert did not regularly attend. Knippen testified that during the pendency of this case Rebecca and Robert split.

{¶20} As to the visits, Knippen testified that she was constantly coaching Rebecca and instructing her on basic safety. Knippen testified that Rebecca was easily distracted and constantly had to be redirected. Knippen testified that Rebecca was willing to listen, but she still had to constantly be reminded of proper safety issues. Knippen testified that she had concerns for Rebecca being able to care for B.S.

{¶21} Next the ACCSB called Sara Ridenour, a social worker/caseworker with the ACCSB. Ridenour testified that Rebecca and Robert's ability to house B.S. had been an issue since the inception of this case. Ridenour testified that when B.S. was born Rebecca and Robert had no identified place to take him. Ridenour testified that from March 2014 to December 2014 Rebecca and Robert changed residences *ten times*. Ridenour testified that Rebecca and Robert were only on one lease out of those ten residences and they were evicted from that residence for using marijuana and not paying rent. (Tr. at 63). Further, Ridenour testified that since January of 2015 Rebecca had changed residences four times, making fourteen residences in just over a year.

{¶22} In addition, Ridenour testified that Rebecca now resided with Robert's parents and that there were smokers in the home. Ridenour testified that due to B.S.'s respiratory issues, that was not a proper environment for B.S. Ridenour also testified that Robert still smoked cigarettes and marijuana despite being told that smoke would be extremely harmful to B.S. in his condition.

{¶23} Ridenour testified that she had concerns about B.S.'s parents meeting B.S.'s basic needs as they relied heavily on others. Ridenour testified that Rebecca received social security and was her own payee (she had not been at one time), but she often ran out of money and spent her money on things like cigarettes for Robert so that he would not get angry with her. Ridenour testified that Robert had no job, though he reported trying to get one.

{¶24} Ridenour testified that the agency had made diligent and reasonable efforts to reunite Rebecca and Robert with B.S. Ridenour testified she had referred them to parenting classes, had referred them to get vouchers for clothing, and had referred Robert to drug treatment. Ridenour testified that Rebecca and Robert suggested six individuals to place B.S. with, all of whom were investigated and found not to be proper for placement.

{¶25} Ridenour testified that despite attending the parenting classes, Rebecca and Robert had not been able to demonstrate the skills learned there. Ridenour testified that ultimately the agency had helped Rebecca and Robert be the best parents that they could be and she did not think that they would ever be

able to parent B.S.  At the conclusion of Ridenour's testimony, the ACCSB rested its case.

**{¶26}** Rebecca then testified on her own behalf.  Rebecca testified that she had done all the parenting classes required of her, and that she had watched younger children before.  Rebecca testified that she helped babysit children sometimes.  Rebecca testified that she did not have a job, but she received SSI in the amount of $488 per month.

**{¶27}** Rebecca also testified that she was separated from Robert and that Robert was now living with his "minor girlfriend."  (Tr. at 96).  Rebecca testified that Robert was still smoking marijuana.  Rebecca also admitted that there is a smoker in the residence she is currently staying in.

**{¶28}** At the conclusion of Rebecca's testimony the hearing was continued to a second day to give Robert a chance to appear.  However, on the second day, Robert again did not appear and he had told Rebecca he was not coming.  In brief closing arguments, the court appointed advocate for B.S. recommended that permanent custody be granted to the ACCSB.  In addition, both the GAL for Rebecca and the GAL for Robert recommended that permanent custody be granted to the ACCSB, stating that it was in the best interests of Rebecca and Robert respectively.

**{¶29}** On June 23, 2015, the trial court filed a judgment entry on the matter. In the entry the trial court summarized the evidence and made a number of factual

findings. The trial court analyzed all the testimony and the psychological evaluations and ultimately determined that permanent custody should be granted to the ACCSB.

{¶30} It is from this judgment that Rebecca appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE TRIAL COURT COMMITTED A REVERSIBLE ERROR BY FINDING THAT REASONABLE CASE PLANNING AND DILIGENT EFFORTS WERE MADE BY THE AGENCY TO ASSIST THE PARENTS TO REMEDY THE PROBLEMS THAT INITIALLY CAUSED THE CHILD TO BE PLACED OUTSIDE THE HOME, [AND BY FINDING THAT] THE PARENT HAS FAILED TO CONTINUOUSLY AND REPEATEDLY SUBSTANTIALLY REMEDY THE CONDITIONS CAUSING THE CHILD TO BE PLACED OUTSIDE THE CHILD'S HOME WHERE THE MOTHER DID ALL CASE PLAN SERVICES.**

**ASSIGNMENT OF ERROR 2**
**TRIAL COURT COMMITTED A REVERSIBLE ERROR BY FINDING THAT CHRONIC MENTAL ILLNESS, CHRONIC EMOTIONAL ILLNESS, MENTAL RETARDATION, PHYSICAL DISABILITY, OR CHEMICAL DEPENDENCY OF THE MOTHER IS SO SEVERE THAT IT MAKES THE PARENT UNABLE TO PROVIDE AN ADEQUATE PERMANENT HOME FOR THE CHILD WHERE THE MOTHER HAS COMPLETED THE CASE PLAN, IS ABLE TO MAKE HER OWN FINANCIAL DECISIONS, AND HAS PROVIDED FOR KIDS IN THE PAST.**

*First Assignment of Error*

{¶31} In her first assignment of error Rebecca argues that the ACCSB did not make reasonable and diligent efforts toward reunification in this case, and that

she complied with her case plan making the trial court's findings to the contrary pursuant to R.C. 2151.414(E)(1) improper. Rebecca also argues that she regularly attended her visitation, that she completed her parenting classes and always cooperated and expressed her willingness to comply with the case plan.

{¶32} Revised Code 2151.414(E) sets forth a number of factors the juvenile court must consider in determining if "a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents." The juvenile court need only find the existence of one of the enumerated factors. *In re D.C.*, 12th Dist. Fayette No. CA2015–03–006, 2015-Ohio-3178, ¶ 31. "If the trial court finds one of the factors present by clear and convincing evidence, the trial court must make a finding that the child cannot be placed with the parent(s)." *In re K.R.*, 11th Dist. Trumbull No. 2015-T-08, 2015-Ohio-2819, ¶ 13.

{¶33} Here, the trial court made findings under R.C. 2151.414(E)(1) *and* R.C. 2151.414(E)(2), both indicating that B.S. could not be placed with either parent within a reasonable period of time or should not be placed with them. Under this assignment of error, Rebecca challenges the trial court's finding under R.C. 2151.414(E)(1), which reads,

> **(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A)**

**of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:**

**(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**

Rebecca specifically challenges the trial court's findings that the agency made reasonable efforts to support reunification and the trial court's finding that she did not comply with the case plan.

ACCSB's Reasonable Efforts

**{¶34}** " 'Reasonable efforts' have been described as the state's efforts to resolve a threat to a child's health or safety before removing the child from the home or permitting the child to return home again, which follow an intervention to protect a child from abuse or neglect." *In re H.H.*, 9th Dist. Summit No. 25463, 2010-Ohio-5992, ¶ 10, citing *In re C.F.,* 113 Ohio St.3d 73, 2007–Ohio–1104, at ¶ 28 (additional citations omitted). These efforts are required because of the

fundamental nature of the right to parent one's children. *Id.* citing *In re C.F.,* 2007–Ohio–1104, ¶ 21.

**{¶35}** The Ohio Supreme Court has emphasized that the broad purpose of Ohio's child-welfare laws is "to care for and protect children, 'whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety.' " *In re C.F.*, *supra*, at ¶ 29, quoting R.C. 2151.01(A). Various sections of the Revised Code refer to the agency's duty to preserve or reunify the family unit. *Id.* In other words, when the state intervenes in a parent-child relationship, it has a considerable duty to rehabilitate the family through a comprehensive plan of reunification.

**{¶36}** Nevertheless, the Ohio Supreme Court has held that the trial court is not obligated by R.C. 2151.419 to make a determination that the agency used reasonable efforts to reunify the family at the time of the permanent custody hearing *unless* the agency has not established that reasonable efforts have been made prior to that hearing. *See In re C.F.,* 113 Ohio St.3d 73, 2007–Ohio–1104, ¶¶ 41, 43. According to the Ohio Supreme Court, the trial court is only obligated to make a determination that the agency has made reasonable efforts to reunify the family at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children,

all of which occur prior to a decision transferring permanent custody to the state." *Id*. at ¶ 41.

**{¶37}** In this case, the magistrate entered a finding that the agency had made reasonable efforts to reunify the family on multiple occasions including the adjudicatory hearing and the dispositional hearing. (Doc. Nos. 35, 38). In reviewing the magistrate's decisions from those hearings, the trial court also made the findings that the ACCSB had made reasonable efforts to reunify the family. (Doc. Nos. 46, 48). Thus according to the Ohio Supreme Court, the trial court was not required to even make this finding again in its permanent custody entry.

**{¶38}** Regardless of whether the trial court needed to make the finding regarding reasonable efforts towards reunification again, the trial court did make the finding that the ACCSB had made reasonable efforts to reunify the family in its judgment entry granting permanent custody, and contrary to Rebecca's arguments it is supported by the record. The *only* argument that Rebecca makes to establish that the agency did not make reasonable efforts is that Rebecca should have been granted more visitation with B.S. Rebecca provides no legal support or factual support as to how this establishes that the ACCSB did not make reasonable efforts toward reunification.

**{¶39}** Moreover, the record established that the ACCSB made a number of attempts to assist Rebecca, evaluate her, reunite her with B.S., and even find alternative placement for B.S. The record established that Rebecca was placed in

classes, that she was referred to places that would provide her clothing and that she was closely monitored in her interactions with B.S. The record further established that the case aids regularly assisted Rebecca during her interactions with B.S. Unfortunately the record also demonstrated that Rebecca was simply not going to be capable of parenting B.S.

{¶40} On the basis of the record before us Rebecca has not demonstrated that the trial court erred in determining that the agency made reasonable efforts toward reunification. Thus Rebecca's argument is not well-taken.

Compliance with Case Plan

{¶41} Rebecca's next argues that the trial court erred in determining that she continuously failed to complete the case plan. While everyone agrees that Rebecca completed her parenting classes and regularly attended her visitation, the only testimony presented was that Rebecca did not demonstrate what she had learned in those classes and that she had to constantly be monitored and redirected as to how to care for B.S. in the visitation she did exercise.

{¶42} In addition, Rebecca did not show she was able to provide for B.S., which was part of the case plan. She also did not establish that she had a suitable home for B.S. to live in. Rebecca had lived in approximately fourteen residences in just over a year, and her current residence, where she wanted B.S. to live, contained a smoker, which was extremely hazardous to B.S.'s condition. Notably Rebecca was also staying in the living room of that home. Thus we cannot find

that the trial court erred in finding that Rebecca failed to complete the case plan as she clearly failed to complete several important facets. Accordingly, Rebecca's first assignment of error is overruled.

*Second Assignment of Error*

{¶43} In Rebecca's second assignment of error she argues that the trial court erred by finding pursuant to R.C. 2151.414(E)(2) that B.S. could not be placed with her in a reasonable amount of time. Specifically, Rebecca argues that despite any cognitive limitations she managed her own funds, was capable of caring for herself and that she testified to caring for other children.

{¶44} At the outset we would note that the trial court only has to find that *one* factor in R.C. 2151.414(E) is present to support its grant of permanent custody before proceeding to determine whether granting permanent custody is in the child's best interest.[1] In this case the trial court found two factors of R.C. 2151.414(E) present, both (E)(1) and (E)(2). In the previous assignment of error we already determined that the trial court did not err in finding reasonable efforts toward reunification had been made and that it did not err in finding that Rebecca failed to comply with the case plan pursuant to R.C. 2151.414(E)(1), thus we need not proceed to determine whether the trial court's finding pursuant to R.C. 2151.414(E)(2) was supported by the record as it is a superfluous finding and would not impact the judgment even if we found Rebecca's argument well-taken.

---

[1] Rebecca does not challenge the trial court's finding regarding B.S.'s best interests on appeal.

Case No. 1-15-44

*In re Matthews*, 3d Dist. Marion Nos. 9-07-28, 9-07-29, 9-07-34, 2008-Ohio-276,

¶ 34. Nevertheless, in the interest of justice we will address Rebecca's argument.

{¶45} Under this assignment Rebecca challenges the trial court's finding

regarding R.C. 2151.414(E)(2), which reads,

> **(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:**
>
> **\* \* \***
>
> **(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code[.]**

{¶46} On appeal Rebecca argues that the trial court's finding pursuant to

R.C. 2151.414(E)(2) was not supported because she manages her own funds and

because she testified to occasionally caring for other children. Rebecca contends

this is not consistent with a developmental disability so severe that it rendered her

unable to provide an adequate permanent home for B.S.

-18-

**{¶47}** Despite Rebecca's arguments, the record made clear that she had significant cognitive limitations. In addition, the psychological evaluation of her indicated that she was at high risk to physically abuse B.S. due to her emotional state. The evaluation also indicated that parenting classes would not likely *ever* improve Rebecca's ability to parent to the point where she could parent a child without supervision. Thus on the basis of Dr. Hustak's evaluation, we cannot find that the trial court erred by entering a finding pursuant to R.C. 2151.414(E)(2). Therefore, Rebecca's second assignment of error is overruled.

**{¶48}** Having found no error prejudicial to Rebecca in the particulars assigned, Rebecca's assignments of error are overruled and the judgment of the Allen County Common Pleas Court, Juvenile Division, is affirmed.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, J.J, concur.**

**/hlo**