[Cite as *In re C.C.*, 2020-Ohio-1189.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

| | |
|---|---|
| IN RE: | CASE NO. 9-19-21 |
| C.C., | |
| [JUANITA SHELP - APPELLANT] | O P I N I O N |

| | |
|---|---|
| IN RE: | CASE NO. 9-19-22 |
| M.C., | |
| [JUANITA SHELP - APPELLANT] | O P I N I O N |

**Appeals from Marion County Common Pleas Court
Family Division
Trial Court Nos. 17 AB 0095 and 17 AB 0096**

**Judgments Affirmed**

**Date of Decision: March 30, 2020**

**APPEARANCES:**

    *Mark M. Noland* **for Appellant**

    *Justin Kahle* **for Appellee**

**WILLAMOWSKI, J.**

{¶1} Appellant Juanita Shelp ("Shelp") appeals the judgments of the Family Division of the Marion County Court of Common Pleas, alleging (1) that the trial court erred in finding that Marion County Children Services ("MCCS") made reasonable efforts to reunify M.C. and C.C. with their parents and (2) that the trial court erred in determining that the case plan could not be completed in a reasonable amount of time. For the reasons set forth below, the judgments of the trial court are affirmed.

*Facts and Procedural History*

{¶2} Shelp is the mother of M.C. and C.C. Doc. A46, B42.[1] The father of M.C. and C.C. is Joey Callahan ("Callahan"). Doc. A2, B2. On April 28, 2017, MCCS filed complaints that alleged that M.C. and C.C. were neglected children. Doc. A1, B1. MCCS filed this motion after learning that Shelp went on a trip with her boyfriend and left M.C. and C.C. in the care of her father, who is a registered sex offender. Doc. A1, B1. Leaving her children with a registered sex offender violated an existing court order. Doc. A1, B1. Further, the children were appearing at school in dirty clothes. Doc. A1, B1. At this time, one of the children had rotting teeth for lack of proper dental care. Doc. B106. This child had to have surgery to rectify this condition. Doc. B106.

---

[1] C.C. is the subject of trial court Case No. 17-AB-95 and Appellate Case No. 9-19-21. Docket numbers for this case will be preceded by the letter "A." M.C. is the subject of trial court Case No. 17-AB-96 and Appellate Case No. 9-19-22. Docket numbers for this case will be preceded by the letter "B."

{¶3} Following a hearing on November 6, 2017, M.C. and C.C. were adjudicated dependent children. Doc. A33, B30. After a dispositional hearing on January 4, 2018, the trial court issued an order that allowed MCCS to retain temporary custody of the children. Doc. A35, B32. On July 11, 2018, MCCS filed motions for permanent custody for M.C. and C.C. Doc. A46, B42. The trial court held hearings on the motion for permanent custody on January 8, 2019 and March 7, 2019. Doc. A112, B108.

{¶4} At the January 8, 2019 hearing, Dr. Kim Stark ("Dr. Stark") testified about a psychological evaluation that she had conducted for Shelp. January 8 Tr. 1. Dr. Stark stated that Shelp satisfied "the criteria for Post Traumatic Stress Disorder" ("PTSD") because of Shelp's past of being homeless and Shelp's childhood. *Id*. at 44. However, Dr. Stark stated that the PTSD was not the reason that Shelp was struggling to complete the case plan. *Id*. at 46. She testified that "Shelp's cognitive abilities place her at the equivalent of a nine to eleven-year-old." *Id*. at 46. She stated that Shelp's cognitive abilities "account for [her] inability to accomplish goals without direct supervision or guidance." *Id*. at 46-47.

{¶5} Dr. Stark further testified that people with Shelp's cognitive function are going to "struggle to problem solve" and "figure things out in life." January 8 Tr. 39. She testified that it was fair to say that people in the range of Shelp's cognitive functioning were "more dependent on others to do * * * normal tasks that other people would * * * just be doing on their own * * *." *Id*. at 42-43. Dr. Stark

concluded that "Shelp's cognitive ability, social development, and cultural foundation are the impeding factors" that are causing her failure to comply with the terms of the case plan. *Id*. at 47.

{¶6} On March 22, 2019, the trial court issued a judgment entry that granted permanent custody of M.C. and C.C. to MCCS. Doc. A112, B108. The appellant filed her notices of appeal on April 10, 2019. Doc. A118, B112. On appeal, Shelp raises the following assignments of error:

**First Assignment of Error**

**The Trial Court erred in finding that the Agency made reasonable efforts to reunify the family as required under Ohio law.**

**Second Assignment of Error**

**The Trial Court erred when it determined that the case plan could not be completed in a timely manner.**

*First Assignment of Error*

{¶7} Shelp asserts that the results of her psychiatric evaluation, as testified to by Dr. Kim Stark, indicated that she needed specialized assistance from MCCS to complete her case plan. She argues that MCCS, in failing to give her this specialized assistance, did not make reasonable efforts to reunify her and her children.

Legal Standard

{¶8} Pursuant to R.C. 2151.419(A)(1), the trial court, in the process of

> **remov[ing] a child from the child's home \* \* \*, shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home \* \* \*.**

R.C. 2151.419(A)(1).  In interpreting this provision, the Ohio Supreme Court held:

> **R.C. 2151.419(A)(1) does not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413. However, except for some narrowly defined statutory exceptions, the state must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights. If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time.**

*In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 21.  Thus,

> **the trial court is only obligated to make a determination that the agency has made reasonable efforts to reunify the family at 'adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children, all of which occur prior to a decision transferring permanent custody to the state.'**

*In re B.S.*, 3d Dist. Allen No. 1-15-44, 2015-Ohio-4805, ¶ 36, quoting *In re C.F.* at ¶ 41.

{¶9} "The agency bears the burden of showing that it made reasonable efforts" at family reunification.  *In re Thomas*, 3d Dist. Hancock No. 5-03-08, 2003-Ohio-5885, ¶ 9.

> **Case plans are the tool that child protective service agencies use to facilitate the reunification of families who, for whatever reason, be it abuse, neglect or otherwise, have been temporarily separated.  Case plans establish individual goals, concerns and the**

> **steps that the parent and agency will take in order to achieve reunification.**

*In re Evans*, 3d Dist. Allen No. 1-01-75, 2001 WL 1333979, *3 (Oct. 30, 2001).

> **"Agencies have an affirmative duty to diligently pursue efforts to achieve the goals in the case plan." [*In re T.S.*, 3d Dist. Mercer Nos. 10-14-13, 10-14-14, and 10-14-15, 2015-Ohio-1184, ¶ 27], citing *In re Evans* at *3. 'Nevertheless, the issue is not whether there was anything more that [the agency] could have done, but whether the [agency's] case planning and efforts were reasonable and diligent under the circumstances of this case.' [*In re T.S.*], quoting *In re Leveck*, [3d Dist. Hancock Nos. 5-02-52, 5-02-53, and 5-02-54,] 2003-Ohio-1269, ¶ 10. "'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *In re H.M.K.*, [3d Dist. Wyandot Nos. 16-12-15 and 16-12-16,] 2013-Ohio-4317, ¶ 95, quoting *In re M.A.P.*, 12th Dist. Butler Nos. CA2012-08-164 and CA2012-08-165, 2013-Ohio-655, ¶ 47. 'We also note that the statute provides that in determining whether reasonable efforts were made, the child's health and safety is paramount.' *In re T.S.* at ¶ 27, citing R.C. 2151.419(A)(1).**

*In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 25.

{¶10} On appeal, a trial court's finding that the agency made reasonable efforts to reunify the family is reviewed under an abuse of discretion standard. *Id.* at ¶ 24. An abuse of discretion is not merely an error in judgment. *Southern v. Scheu*, 3d Dist. Shelby No. 17-17-16, 2018-Ohio-1440, ¶ 10. Rather, to constitute an abuse of discretion, the trial court's decision must be unreasonable, arbitrary, or capricious. *Schroeder v. Niese*, 2016-Ohio-8397, 78 N.E.3d 339, ¶ 7 (3d Dist.).

Legal Analysis

{¶11} On June 1, 2017, MCCS filed case plans with the trial court. Doc. A13, B13. The primary goal of these plans was for Shelp to reach a point where she could independently and consistently provide for the basic needs of her children. Doc. A13, B13. On October 18, 2017, MCCS reported that Shelp had not completed an assessment for services or engaged in any parenting services. Doc. A27, B25. Further, MCCS stated that Shelp was not working at this time and had no reliable source of income. Doc. A27, B25. In this report, MCCS also noted that Shelp was supposed to be taking medications and attending counseling for mental health issues but was not doing so. Doc. A27, B25. This report also noted that Shelp left her children with a registered sex offender while she traveled with her boyfriend. Doc. A27, B25. The report noted the importance of developing Shelp's capacity to provide for the basic needs of M.C. and C.C. consistently. Doc. A27, B25.

{¶12} On April 17, 2018, MCCS reported to the trial court that Shelp had an appointment with Dr. Stark for a psychological assessment. Doc. A39, B36. MCCS's filing further stated that Shelp was not taking all of her prescribed medications; that Shelp was engaging in parenting services; and that she had completed an assessment for counseling services. Doc. A39, B36. This report concluded with the following observation:

> **The family needs to find stability, not just complete case services. This stability includes housing in the same place for an extended period of time, maintaining the legal source of income,**

> **maintaining stable relationships * * * and being able to utilize knowledge gained from services in interactions with others, as well as self sufficiency.**
>
> **Separately, [Shelp] and [Callahan] need to be able to consistently maintain the demands of being a full time parent on top of their own mental health treatment and employment in addition to ensuring the children are linked with educational and community support services locally.**

Doc. A39, B36. At this point, Shelp still did not have a reliable income or consistent employment. Doc. A39, B36.

{¶13} At the hearing on January 8, 2019, Dr. Stark testified that, based on her observations, she had recommended that Shelp continue to seek help from Village Network and have a case manager put in place to help her in addition to a caseworker. January 8 Tr. at 52. She also recommended that Shelp complete a program called Bridges Out of Poverty. *Id*. at 53. She also said that Shelp did not seem to understand the importance of making the changes required under the case plan. *Id*. at 65. Dr. Stark stated that she could not answer questions about Shelp's ability to raise her children when they were in their teenage years or about Shelp's general ability to make good judgments. *Id*. at 67-68.

{¶14} At the hearing on March 7, 2019, Karena Pryor ("Pryor"), who was a caseworker with MCCS, testified that Shelp failed to complete the Bridges Out of Poverty program and the Voice of Hope parenting classes. March 7 Tr. 138, 146, 148. Pryor stated that the case plan goals for Shelp included having a stable housing environment, obtaining mental health treatments, regularly taking medications, and

meeting with caseworkers. *Id.* at 143. She stated that Shelp lived in housing provided by the Department of Housing and Urban Development ("HUD") but that she had people living in her housing that were not listed as household members. *Id.* at 154. Pryor testified that this was not permitted by HUD and that this could impact Shelp's ability to keep this housing. *Id.*

{¶15} She also testified that, while they were in Shelp's care, M.C. and C.C. were having issues with missing school and being late to school. March 7 Tr. 151. Pryor also stated that MCCS was concerned about Shelp continuing to allow her children to be around registered sex offenders. *Id.* at 161. To Pryor's knowledge, Shelp was not employed at that time. *Id.* at 167. Pryor further testified that MCCS gave Shelp referrals to individuals and to programs that could help her to achieve the objectives of the case plan. *Id.* at 178.

{¶16} The case plan called for Shelp to follow through with Guidestone, but Pryor stated that Shelp did not use this resource. March 7 Tr. 195. She stated that MCCS then directed Shelp to Village Network in 2017 and that Shelp did not avail herself of this resource until January of 2019. *Id.* Pryor concluded that Shelp did not complete the case plan and that MCCS's concerns had not been alleviated by Shelp's conduct. *Id.* at 163. Pryor stated that she did not believe that Shelp had demonstrated that she had the ability as a parent to provide C.C. and M.C. with the stability that they needed. *Id.* at 179. Pryor also stated that Shelp did not provide

any names of family members who were willing to be considered as placement options. *Id*. at 180.

{¶17} Pryor also stated that Shelp progressed from onsite visitation with her children at MCCS to unsupervised visitation with her children at her house. March 7 Tr. 158. However, Pryor stated that Shelp was not following the guidelines for unsupervised visitation. *Id*. at 159. In particular, Shelp was taking the children to houses that were not approved by MCCS. *Id*. Pryor further testified that MCCS had concerns about who the children were around during these unsupervised visits. *Id*. at 160. Due to these issues, these unsupervised visits were discontinued roughly two weeks before the March 7, 2019 hearing. *Id*. at 159.

{¶18} Megan Kibler ("Kibler") was one of M.C. and C.C.'s foster parents. March 7 Tr. 3. M.C. and C.C. had been placed with Kibler for roughly one year, returned to Shelp for nine months, and then were placed again with Kibler. *Id*. at 3. She stated that, when M.C. first came to live with her, his teeth were rotting. *Id*. at 23. M.C. had to have oral surgery to correct this dental issue. *Id*. During the nine months in which C.C. was with Shelp, he lost weight. *Id*. at 19. Kibler testified that she became aware that Shelp was allowing M.C. and C.C. to visit with Shelp's father even though Shelp was instructed not to allow such visits. *Id*. at 15.

{¶19} Shelp testified that she had been ordered to keep her children away from her father. March 7 Tr. at 83. She denied allowing her children to be around her father during her unsupervised visits with C.C. and M.C. *Id*. at 94. However,

Kibler testified that M.C. and C.C. had indicated otherwise. *Id.* at 15. Shelp stated that she was not employed at the time of this hearing. *Id.* at 114. In recent months, she had begun and left multiple jobs. *Id.* at 95-97. She testified that her food stamps were subject to sanction at the time of the hearing because she had not been completing the work requirements. *Id.* at 118.

{¶20} On October 17, 2019, MCCS reported to the trial court that Shelp had met with Dr. Stark for a psychological evaluation. Doc. A78, B74. At this time, Shelp was not taking all of her medications and had stopped engaging with parenting services. Doc. A78, B74. She had also changed jobs. Doc. A78, B74. Further, MCCS determined that there were no other appropriate kinship placements for M.C. or C.C. Doc. A78, B74.

{¶21} These reports indicate that MCCS was willing to assist Shelp in reaching the objectives of her case plan. MCCS noted Shelp's unique needs and ongoing mental health issues. However, MCCS's reports indicate that Shelp was not responsive over this period of time to the services that were designed to help her develop the abilities necessary to provide a stable home life for M.C. and C.C. The testimony at trial indicates that MCCS referred Shelp to Dr. Stark to help determine the underlying mental health issues that were impeding Shelp from achieving the goals of the case plan. However, Shelp did not comply with Dr. Stark's recommendations.

{¶22} Further, MCCS attempted to help Shelp progress towards reunification by facilitating supervised visitation and then unsupervised visitation. However, Shelp failed to comply with the requirements placed upon her during these visits. March 7 Tr. at 161. MCCS also attempted to find kinship placement options for M.C. and C.C., but Shelp did not provide any names of relatives. *Id*. at 178. For these reasons, MCCS concluded, in its motion for permanent custody, that Shelp had not demonstrated that she could provide the children with a stable home environment based upon how she failed to comply with the terms of the case plan. Doc. B42.

{¶23} In this case, the trial court found, in its judgment entry, that MCCS made reasonable efforts to reunify the M.C. and C.C. with their family. Doc. B108. After examining the evidence in the record, we do not find any indication that the trial court abused its discretion in making this determination. For this reason, Shelp's first assignment of error is overruled.

*Second Assignment of Error*

{¶24} Shelp argues that she completed most of the objectives in her case plan and that she could not attain further progress, given the results of her psychiatric evaluation. For this reason, she asserts that the trial court's determination is against the manifest weight of the evidence.

Legal Standard

**{¶25}** "R.C. 2151.413 permits an agency that has been granted temporary custody of a child who is not abandoned or orphaned to move for permanent custody." *In re Leveck*, *supra*, at ¶ 8. "When considering a motion for permanent custody of a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414." *In re A.M.*, *supra*, at ¶ 13. Under R.C. 2151.414(B)(2),

> **the court shall grant permanent custody of the child to the movant if the court determines in accordance with division (E) of this section that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of this section that permanent custody is in the child's best interest.**

R.C. 2151.414(B)(2).

**{¶26}** R.C. 2151.414(E) reads, in its relevant part, as follows:

> **(E) In determining * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:**
>
> **(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social**

> **and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.**
>
> **(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;**

R.C. 2151.414(E)(1-2).

> **Upon review, an appellate court 'must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof.' 'A reviewing court will not reverse a trial court's determination unless it is not supported by clear and convincing evidence.'**

(Citations omitted.) *In re A.M.*, *supra*, at ¶ 16, quoting *In re H.M.K.*, *supra*, at ¶ 43.

> **Clear and convincing evidence is more than a preponderance of the evidence but not as much evidence as required to establish guilt beyond a reasonable doubt as in a criminal case; rather, it is evidence which provides the trier of fact with a firm belief or conviction as to the facts sought to be established.**

*In re A.M.* at ¶ 16, quoting *In re H.M.K.* at ¶ 42.

Legal Analysis

{¶27} In this case, the trial court determined that M.C. and C.C. could not be placed with their parents within a reasonable amount of time, finding the factors in R.C. 2151.414(E)(1) and R.C. 2151.414(E)(2) to be applicable. A112, B 108. The reasons that MCCS first filed for temporary custody included the fact that M.C. and C.C. were late to school, unkempt, and dirty. Doc. A110, B106. Further, the

children's teeth were rotting for lack of dental care. Doc. A110, B106. Shelp also left M.C. and C.C. in the care of a registered sex offender in violation of the terms of reunification while she traveled with her boyfriend. Doc. A110, B106.

{¶28} On July 11, 2018, MCCS filed a report on Shelp's progress in the case plan with its motion for permanent custody. Doc. A46, B42. MCCS reported that Shelp was "resistant to parenting classes" and did not follow through with in home services provided by Guidestone. Doc. A46, B42. Shelp also violated terms of the case plan that required her to refrain from babysitting other people's children. Doc. A46, B42. This report concluded that

> **The setbacks in this case are continuous and fall back on the ability of the parents to stabilize their lives to provide consistent care for their children and meet their basi[c] needs as well as the need for supervision and medical care.**

Doc. A46, B42. Similarly, MCCS's earlier filings with the trial court, as detailed in the first assignment of error, indicate a pattern of inconsistent compliance with the objectives of the case plan and a failure to fundamentally change the behaviors that led to MCCS filing its motion for temporary custody in 2017. Doc. A39, B36.

{¶29} At the January 8, 2019 hearing, Dr. Stark testified about the ongoing obstacles that Shelp faced in reaching the goals of the case plan and provided would prevent Shelp from summarily completing the goals of the case plan. These recommendations were designed for Shelp and her particular needs. However,

according to Shelp and Pryor's testimony, Shelp did not follow the recommendations provided by Dr. Stark to help Shelp address these obstacles.

{¶30} At the March 7, 2019 hearing, Kathy Butler ("Butler"), who works for Marion City Schools, testified that C.C. had "sporadic attendance" when he was in the custody of Shelp. March 7 Tr. 62. When Shelp testified at this hearing, however, she stated that she "always made sure they [C.C. and M.C.] were to school on time * * *." *Id.* at 85. Shelp also testified that she put her best efforts into complying with the case plan from MCCS. *Id.* at 222, 227. She admitted that her ex-boyfriend was a safety threat that caused her to move visitation with her children to a different location from her home. *Id.* at 120, 229.

{¶31} On March 19, 2019, the guardian ad litem ("GAL") filed a report with the trial court. Doc. A110, B106. The GAL reiterated that the results of the psychological evaluation showed that Shelp had the cognitive abilities "at the level of a 9 to 11-year-old" and that Shelp "struggles with problem-solving and adhering to standards." Doc. A110, B106. The GAL also found that Shelp was unable to control the children and raised her voice at them. Doc. A110, B106.

{¶32} In this report, the GAL also stated that Shelp appeared not to be forthcoming about whether the children had contact with Shelp's father. Doc. A110, B106. The children reported that they had visited Shelp's father to their foster parents and to their social worker. The children further stated that they were told not to tell anyone about visiting Shelp's father. Doc. A110, B106. Shelp had been

ordered, as part of the case plan, to keep her children away from her father. Doc. A110, B106. The GAL noted that Dr. Stark indicated that Shelp's cognitive abilities would require her to have constant mentoring. Dr. Stark further indicated that "Shelp does not have the cognitive capacity to understand, nor does she have the social development to understand why living any other way is necessary or more socially acceptable." Doc. B106.

{¶33} The GAL stated that Shelp "has always been able to repeat what she has learned at parenting class, but is not * * * able to implement what she has been taught. Accordingly, in my opinion, Ms. Shelp would not be able to successfully parent her children through their teen years and into adulthood." Doc. B106. The GAL also reported that Dr. Stark's findings from Shelp's psychiatric evaluation indicate why Shelp has been unable to comply with the case plan and has failed, in the past, to give the children medical care. Doc. A110, B106. The GAL then stated that he believed that it would not be appropriate to reunite the children with either of their parents and that their best interests would be served by remaining in the custody of MCCS.

{¶34} After reviewing the evidence in the record, we do not find any indication that the trial court erred in determining that M.C. and C.C. could not be placed with either of their parents within a reasonable amount of time. The information in the record contains clear and convincing evidence in support of the

trial court's decision. For these reasons, Shelp's second assignment of error is overruled.

*Conclusion*

**{¶35}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgments of Family Division of the Marion County Court of Common Pleas are affirmed.

***Judgments Affirmed***

**SHAW P.J. and ZIMMERMAN J., concur.**

**/hls**